# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
April 25, 2000 Session

## HAROLD WAYNE NICHOLS v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Hamilton County**
**Nos. 205863, 213883-213896   D. Kelly Thomas, Jr., Judge, By Designation**

---

**No. E1998-00562-CCA-R3-PD**
**January 19, 2001**

---

The petitioner filed petitions for post-conviction relief for his conviction for first degree felony murder and his sentence of death, as well as for a number of convictions for sexual attacks on four additional victims.  The bases of his complaints were that he had ineffective assistance of counsel at both the guilt and punishment phases of his capital trial, as well as in the noncapital cases, two of which were resolved by pleas of guilty.  Specifically, he claimed that counsel failed to adequately investigate and prepare his cases; failed to question the probable cause for his arrest; and failed to question whether his confessions were "false." He raised additional claims of ineffective assistance of counsel and claims regarding the unconstitutionality of the imposition of capital punishment. The post-conviction court denied the claims other than to order new sentencing hearings in the noncapital cases.  The petitioner then timely appealed the post-conviction court's rulings, other than the ordering of new sentencing hearings.  We have carefully reviewed the record and, based upon our review, we affirm the judgments of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and THOMAS T. WOODALL, JJ., joined.

Ardena J. Garth, District Public Defender; Mary Ann Green, Assistant Public Defender; and Donald E. Dawson, Post-Conviction Defender, for the appellant, Harold Wayne Nichols.

Paul G. Summers, Attorney General and Reporter; Marvin S. Blair, Assistant Attorney General; William H. Cox, III, District Attorney General; C. Leland Davis, Assistant District Attorney General; C. Caldwell Huckabay, Assistant District Attorney General; and Glenn R. Pruden, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The petitioner, Harold Wayne Nichols, appeals from the judgment entered in the Criminal Court of Hamilton County denying post-conviction relief from his 1990 conviction for first degree

felony murder and sentence of death by electrocution, as well as convictions for aggravated rape and first degree burglary resulting from the same facts. In addition, consolidated with the post-conviction appeal in the capital case, is Nichols's appeal from the judgments entered in the Criminal Court of Hamilton County denying him post-conviction relief from his 1989 and 1990 convictions of first degree burglary, aggravated rape, and larceny and sentences of imprisonment resulting from separate proceedings stemming from a series of attacks against four other women, except for that portion of the judgments requiring new sentencing hearings in the noncapital cases.

The sentence of death was affirmed on direct appeal to the Tennessee Supreme Court. See State v. Nichols, 877 S.W.2d 722 (Tenn. 1994), cert. denied, 513 U.S. 1114, 115 S. Ct. 909, 130 L. Ed. 2d 791 (1995). This court affirmed the judgments of the trial court in the noncapital cases tried in State v. Harold Wayne Nichols, No. 03C01-9108-CR-00236, 1995 WL 755957 (Tenn. Crim. App. Dec. 19, 1995). No application for permission to appeal to the Tennessee Supreme Court, pursuant to Tennessee Rule of Appellate Procedure 11, was filed in these cases.

In his appeals, the petitioner raises the following issues:

I.    Petitioner received ineffective assistance of counsel at the guilt stage by (a) trial counsel's failure to analyze evidence demonstrating the petitioner's confession was unreliable and (b) counsel's failure to investigate and analyze evidence of the petitioner's actual innocence;

II.   Petitioner was denied the effective assistance of counsel by the failure of his trial counsel to file a motion to suppress his statements on the theory that the statements were made during a period of illegal arrest;

III.  Trial counsel failed to provide effective assistance of counsel in the penalty phase;

IV.   Petitioner was denied effective assistance of counsel by the failure of his trial counsel to object to improper argument and cross-examination by the prosecutor and failure to raise prosecutorial misconduct in the motion for a new trial or on appeal;

V.    Petitioner's counsel were ineffective for failing to request jury instructions and for failing to object to the trial court's improper jury instructions;

VI.   The findings of fact by the court below were clearly erroneous;

VII. Counsel rendered ineffective assistance by failing to raise at trial or on appeal that death by electrocution is cruel and unusual punishment;

VIII. Trial and appellate counsel rendered ineffective assistance by failing to argue in the trial court or on appeal that requiring petitioner to turn over his psychiatric expert's rough notes, which included statements made by petitioner to his psychiatric expert, violated petitioner's right to remain silent in violation of the Fifth and Fourteenth Amendments to the United States Constitution and Article I, section 9 of the Tennessee Constitution;

IX. There was a "Kyles v. Whitley" accumulation of prejudicial errors;

X. The sentence of death in the instant case must be set aside as the imposition of death is unreliable and violates the values recognized and protected by the Eighth and Fourteenth Amendments to the Constitution of the United States and Article I, section 16 of the Tennessee Constitution; and

XI. The death sentence is unconstitutional, because it infringes upon petitioner's fundamental right to life, and is not necessary to promote any compelling state interest.

Because of the complexity of this matter resulting from consolidation of several petitions for post-conviction relief encompassing a number of convictions, we will first detail the charges which are under consideration in the combined petitions for post-conviction relief.[1] They are as follows:

| Victim and Case No. | Offense Charged | Date of Offense | Disposition | Sentence |
|---|---|---|---|---|
| Karen Pulley No. 180573 | First Degree Murder | 9-30-88 | Pled Guilty Jury Sentence | 12-14-90 Death |
| Karen Pulley | Aggravated Rape | 9-30-88 | Pled Guilty | 12-14-90 |

[1]The victims of the sexual assaults, other than the victim who was also murdered, will be identified by initials only.

| | | | | |
|---|---|---|---|---|
| No. 175423 | | | 5-1, 2-90 | 60 years |
| Karen Pulley No. 175425 | First Degree Burglary | 9-30-88 | Pled Guilty 5-1, 2-90 | 12-14-90 15 years |
| P.G. No. 180535 | First Degree Burglary | 12-20-88 | Jury Trial Guilty 2-21-90 | 12-13-90 15 years |
| P.G. No. 180536 | Petit Larceny | 12-20-88 | Jury Trial Guilty 2-21-90 | Merged into 180535 by court |
| P.G. No. 180537 | Aggravated Rape | 12-20-88 | Jury Trial Guilty 2-21-90 | 12-13-90 60 years |
| T.R. No. 175495 | Aggravated Rape | 12-27-88 | Pled Guilty 9-13-89 | 12-13-90 40 years |
| T.R. No. 175497 | First Degree Burglary | 12-27-88 | Pled Guilty 9-13-89 | 12-14-90 40 years |
| P.R. No. 175438 | Aggravated Rape | 1-3-89 | Jury Trial Guilty 1-11-90 | 12-14-90 60 years |
| P.R. No. 175440 | Aggravated Rape | 1-3-89 | Jury Trial Guilty Reduced to Assault w/Intent to Commit Aggravated Rape 1-11-90 | 12-14-90 20 years |
| P.R. No. 175492 | First Degree Burglary | 1-3-89 | Jury Trial Guilty 1-11-90 | 12-14-90 15 years |
| P.R. No. 178087 | Aggravated Rape | 1-3-89 | Jury Trial Guilty 1-11-90 | 12-14-90 60 years |

| S.T. No. 175433 | Aggravated Rape | 1-3-89 | Pled Guilty 10-24-89 | 12-14-90 60 years |
|---|---|---|---|---|
| S.T. No. 175442 | Grand Larceny Reduced to Petit Larceny | 1-3-89 | Pled Guilty (to Petit Larceny) | 12-14-90 6 years |
| S.T. No. 175490 | First Degree Burglary | 1-3-89 | Pled Guilty | 2-14-91 6 years |

Additionally, the petitioner entered pleas of guilty to rape or attempted rape charges as to five more victims, T.M, T.H., D.L., A.P., and C.B. None of these pleas of guilty were the subject of petitions for post-conviction relief. However, since the entry of a guilty plea in at least one of these cases was the partial basis for a claim of ineffective assistance of counsel, these guilty pleas are relevant to our consideration.

The petitioner's original *pro se* petition for post-conviction relief in the capital case was filed on April 20, 1995, and an amended petition was later filed by counsel. On April 25, 1995, the Public Defender for Hamilton County was appointed to represent the petitioner. Attorney John Brooks was appointed as co-counsel on December 4, 1995. On May 13, 1996, Judge Douglas Meyer recused himself from the case and, by order of the Tennessee Supreme Court, Judge D. Kelly Thomas was designated to preside over the post-conviction hearing. On October 3, 1996, Attorney Brooks was allowed to withdraw and the Office of the Post-Conviction Defender was appointed as co-counsel.

In the noncapital cases, the petitioner filed *pro se* petitions for post-conviction relief on December 18, 1996. Again, Judge D. Kelly Thomas was designated to hear the matters upon the recusal of Judge Douglas Meyer. Judge Thomas appointed the Hamilton County Public Defender and the Office of the Post-Conviction Defender to represent the petitioner. An amended post-conviction petition was filed on February 24, 1997.

A post-conviction hearing on the petitions filed in both the capital and noncapital cases was held over eight days during June and December of 1997, concluding on December 16, 1997. On March 18, 1998, the court, by written order, denied any relief on the post-conviction petition filed in the capital case. On the same date, also by written order, the court denied relief as to the noncapital cases with the exception of granting the petitioner a resentencing hearing in each of these cases.

Notices of appeal in the capital and noncapital post-conviction cases were filed on April 17, 1998. In the noncapital cases, the petitioner's instant appeal is only from the denial of post-conviction relief from his convictions, not from the order granting him resentencing hearings.

An overview of the facts surrounding the petitioner's various convictions may prove helpful in view of the complexity of the matters under review. These consolidated cases involve fifteen

judgments entered as a result of trials or guilty pleas involving five victims. The petitioner pled guilty to the first degree murder of Karen Pulley, and a jury sentenced him to death. As to the noncapital offenses charged, the petitioner also pled guilty to the aggravated rape of Karen Pulley and first degree burglary of her residence, and to rape and other offenses against T. R. and S.T. The petitioner was convicted following jury trials in the P.G. and P.R. matters  The remaining charges covered by a post-conviction petition were resolved by pleas of guilty. The petitioner received sentences totaling 647 years in the noncapital cases.

In addition to the offenses at issue in this post-conviction appeal, the petitioner was charged with and pled guilty to offenses involving the rape or attempted rape of five other victims: T.H., D.L., C.B., T.M., and A.P. Pleas of guilty were entered in these cases after the petitioner's capital murder trial, and no appeals were taken. Throughout the proceedings involving all of the above-noted offenses at trial and on appeal, the petitioner was represented by the same two appointed counsel, against whom he has made claims of ineffective assistance of counsel.

Senior trial counsel appointed by the trial court was a 1966 graduate of Vanderbilt University and a 1969 graduate of Yale Law School. He was a law clerk for a United States District Court judge, an attorney with the Civil Rights Division of the Justice Department for three years, and an Assistant United States Attorney for three years. Previously, he had been counsel in two capital cases, and his practice consisted of ten percent criminal work and ninety percent civil work. He was the author of the voir dire section of the Tennessee Association of Criminal Defense Lawyers ("TACDL") Death Penalty Manual.

Junior trial counsel graduated from George Mason University in 1981 and from the University of Virginia Law School in 1984. She then went into private practice in Chattanooga. She had previously been involved in one capital case, in which the defendant pled guilty and was sentenced to life imprisonment. At the time she was appointed to represent the petitioner, her percent of criminal practice was "about 40 percent, sometimes as high as 60 or 70."

Junior trial counsel was a member of both the National Association of Criminal Defense Lawyers and the TACDL. She was on the board of directors of the TACDL in 1989 and had been a member of the organization for a number of years, holding various offices. She had been the head of their continuing legal education program for a year. She had attended a number of TACDL seminars and had presented a Tennessee criminal law update at "one or two" seminars. Before representing the petitioner, she had attended at least one TACDL capital case seminar, as well as a capital case seminar of the National Association of Criminal Defense Lawyers. Additionally, she had attended criminal seminars presented by the Chattanooga Bar Association.

According to testimony, as well as an exhibit introduced during the post-conviction hearing, the combined hours billed by trial counsel for the matters in which they represented the petitioner were as follows:

        1,386.80        Out-of-court hours in the Karen Pulley case

| 259.75 | In-court hours in the Karen Pulley case |
| 654.50 | Out-of-court hours in the rape cases |
| 29.25 | In-court hours in the rape cases |

According to counsel, the 2,330.30 hours billed were less than the actual combined hours spent on the various matters, but the total was reduced to avoid duplicative billings. Additionally, according to counsel, the 289 in-court hours "were always" with the petitioner present and usually included a meeting with the petitioner in the court anteroom. Further, trial counsel spent "at least" 69.75 hours meeting with the petitioner in the jail.

The investigator retained by trial counsel was Michael Cohan, who had been a self-employed private investigator since 1986. He has a bachelor's degree in criminal justice and had been employed in "one form of police work or another" during most of the years since 1969. For four years, he had been a military police officer and was then employed for two years as a police officer by the University of Tennessee. Next, he was a Metro narcotics officer in Knoxville for about five years and then was the assistant regional director for investigations for the Department of Human Services Welfare Fraud Division for approximately five years. He left that position in 1986 to become a private investigator. According to his time records, he spent fifty-one hours conferring with trial counsel and met with the petitioner on more than one occasion, although the records showed only one six-hour meeting. He recorded 163 hours locating and interviewing witnesses. He had previously been involved in several capital cases but was unable to say exactly how many.

The supreme court's opinion on appeal of the petitioner's death sentence provides the following synopsis of the evidence presented during the sentencing phase of petitioner's capital murder trial:

> The proof showed that on the night of September 30, 1988, the defendant broke into the house where the 21-year-old-victim, Karen Pulley, lived with two roommates in the Brainerd area of Chattanooga, Tennessee. After finding Pulley home alone in her upstairs bedroom, the defendant tore her undergarments from her and violently raped her. Because of her resistance during the rape, he forcibly struck her at least twice in the head with a two-by-four he had picked up after entering the house. After the rape, the defendant, while still struggling with the victim, struck her again several times with great force in the head with the two-by-four. The next morning, one of Karen Pulley's roommates discovered her alive and lying in a pool of blood on the floor next to her bed. Pulley died the next day. Three months after the rape and murder, a Chattanooga police detective questioned the defendant about Pulley's murder while he was in the custody of the East Ridge police department on unrelated charges. It was at this point that the defendant confessed to the

crime. This videotaped confession provided the only link between the defendant and the Pulley rape and murder.

The evidence showed that, until his arrest in January 1989, the defendant roamed the city at night and, when "energized," relentlessly searched for vulnerable female victims. At the time of trial, the defendant had been convicted on five charges of aggravated rape involving four other Chattanooga women. These rapes had occurred in December 1988 and January 1989, within three months after Pulley's rape and murder. The convictions presented to the jury were as follows:

> The defendant was indicted for feloniously engaging in sexual penetration of T.R. on December 27, 1988, by the use of force or coercion while the defendant was armed with a weapon--a cord. The defendant pled guilty to the offense of aggravated rape.

> The defendant was indicted for feloniously engaging in sexual penetration--anal intercourse--with S.T. on the 3rd day of January, 1989, by the use of force or coercion while he, the defendant, was armed with a weapon--a pistol. The defendant pled guilty to aggravated rape.

> The defendant was indicted for feloniously engaging in sexual penetration--fellatio--with [P.R.] on January 3, 1989, thereby causing personal injury to her. The defendant was also indicted for feloniously engaging in sexual penetration--vaginal intercourse--with [P.R.] on January 3, 1989. The defendant pled not guilty and the jury found the defendant guilty of aggravated rape in each case.

> The defendant was indicted for feloniously engaging in sexual penetration, vaginal intercourse, with [P.G.] on December 21, 1988, by the use of force or coercion while he, the defendant, was armed with a weapon--a knife. The defendant pled not guilty and a jury convicted the defendant of aggravated rape.

The primary factors in mitigation presented by the defense were the defendant's cooperation with the police and the psychological effects of his childhood. Several persons who knew the defendant testified to his good character and passive nature.

The defendant also took the stand and testified about his life and the violent crimes he had committed. After his mother died of breast cancer when he was ten years old, he and his older sister were placed in an orphanage for six years by his father, who was apparently emotionally abusive, at least to the defendant's older sister. In 1976, just as he was about to be adopted, he was returned to his father. In 1984 he pled guilty to attempted rape, was sentenced to five years in prison and served eighteen months. Thereafter, he violated parole and served an additional nine months. He was married in 1986. At the time of the killing, he was employed by Godfather's Pizza as a first assistant manager.

Defendant testified that when he committed these violent criminal acts, a "strange energized feeling" that he could not resist would come over him and result in actions that he could not stop. He explained that he had not asked for help for his affliction or told anyone about his criminal activity because he was afraid he would lose everything. He expressed remorse for his actions but testified that, if he had not been arrested, he would have continued to violently attack women.

Finally, Dr. Eric Engum, a lawyer and clinical psychologist, testified that he had diagnosed the defendant with a psychological disorder termed "intermittent explosive disorder." According to Engum, a person suffering from this disorder normally experiences an increasing, irresistible drive that results in some type of violent, destructive act. Dr. Engum opined that the defendant's condition may have grown out of his anger at abandonment in childhood but conceded that the disorder was rare. According to him, the defendant would function normally in an institutional regimented setting but, if released, would repeat the violent behavior. The State offered Dr. Engum's investigating notes to prove that he was a member of the defense team acting as a lawyer searching for a defense, rather than an objective psychologist searching for a diagnosis.

After deliberating approximately two hours, the jury returned a verdict of death based on the two statutory aggravating circumstances.[2]

---

[2]Aggravating circumstances were (1) the murder was committed while the defendant was engaged in committing a felony, and (2) the defendant had prior violent felony convictions. See Tenn. Code Ann. § 39-2-203(i)(2) and (7). Although the supreme court held that the felony murder aggravator was improperly applied based on its holding in State v. Middlebrooks, 840 S.W.2d 317, 346 (Tenn. 1992), it determined any error was harmless and affirmed both Nichols's conviction and sentence. Nichols, 877 S.W.2d at 737-39.

Nichols, 877 S.W.2d at 726-27 (footnote omitted).

Since one of the claims in the post-conviction petitions is that trial counsel were ineffective for not investigating the petitioner's confessions to ascertain whether they were "false," we will detail both the various statements which he made regarding the crimes as well as additional proof.

In addition to the hour-long videotaped statement which the petitioner made regarding the death of Karen Pulley, as described in the supreme court opinion affirming his conviction for that crime, he made additional statements regarding his guilt in that case, as well as the others with which he was charged. On January 6, 1989, beginning at 12:47 a.m., he confessed to law enforcement officers to the rapes of D.L., P.G., P.R., and S.T. These confessions were all short, and the purpose of the questions appeared to be to determine how many rape complaints would be closed as the result of the arrest of the petitioner. Shortly after that, he confessed to a rape and an attempted rape in Tiftonia, occurring apparently in October and December 1988, as well as a third rape that occurred in the same area, the victims not being identified by name and the intent of the questions apparently being to ascertain whether the petitioner had committed these rapes as well. Next, the petitioner confessed to two rapes occurring in Red Bank, with the victims again not being identified by name. Also, the petitioner made additional short confessions as to items he had taken from three rape scenes, one relating to the rape of P.G. The other victims were not identified by name. It appears that all of these statements were tape-recorded. It is unclear how many statements subsequently were made to law enforcement officers in addition to these.

That same morning, an oral statement was taken from the petitioner's wife, who said that beginning in July or August of 1988, the petitioner began going out at night. On some occasions, she would be aware when he left, but other times she "would wake up and he would be gone and [she] would wonder where he was." She said that on January 3, 1989, he left between 8:30 and 9:00 p.m. and returned home about 7:00 a.m. This is the period when P.R. and S.T. were both raped. She told officers that he explained the scratch on his eye when he arrived home by saying that as he was driving with gloves on to pick her up from work, his eye began to itch and, unable to scratch himself because of the gloves, he picked up a screwdriver to do so and poked himself in the eye, cutting himself. She testified in the Karen Pulley trial that she had asked him, presumably after his arrest, about the Pulley murder, and he told her that he was guilty of it.

As trial counsel noted during the post-conviction hearing, the petitioner consistently admitted to them his guilt as to the charges against him. During a meeting with Michael Cohan, the investigator for defense counsel, the petitioner described in detail his attack upon Karen Pulley. Additionally, he admitted his guilt to Dr. Eric Engum, a psychologist retained by trial counsel. Further, he admitted his guilt in the death of Karen Pulley to the victim's mother and told his uncle, during a post-trial visit to the petitioner in prison, that he was guilty. He also testified in court as to his guilt. During the penalty phase of the Karen Pulley trial, the petitioner testified as to his rape and murder of the victim. He was questioned by his trial counsel:

Q. Wayne, let's talk about Karen Pulley. Did you know Karen Pulley?

A. No, I didn't.

Q. Did you intend to kill Karen Pulley when you broke into her house?

A. No.

The petitioner then testified what he had done after entering the victim's house:

A. Well, I went upstairs and seen someone setting [sic] there on the bed. And, you know, it was dark and at the time I didn't know whether it was, you know, male or female until she spoke, and that's when, you know, I attacked her and raped her.

Q. Why did you kill her then?

A. It was just that, you know, she was hanging onto me and, you know, I was trying to leave and stuff, and I just – I don't know.

Q. Did you mean to kill her?

A. No.

Q. Did you?

A. Yes.

During his testimony in the Pulley trial, the petitioner, apparently referring to his confessions to Sergeant Heck regarding other rape victims, said that "getting all this, the other things off my mind – or off my chest was like a relief."

The petitioner made statements, in addition to those previously described in this opinion, regarding the attacks upon the other victims as well. During the trial for the rape of P.R. and the first degree burglary of her residence, Captain Larry Holland of the East Ridge Police Department testified regarding the confession given to him by the petitioner. The following is a portion of the petitioner's statement to Captain Holland, as related during the trial:

Holland: Okay. Can you remember how you got into this house [of P.R.]?

-11-

> Nichols: Yeah.
>
> Holland: How?
>
> Nichols: I entered through the back door which was locked. I used a screwdriver to get the door actually open, and it was chained and I just, you know, pushed the door on open so the chain broke loose. And the woman was upstairs and I got her from upstairs and—
>
> Holland: Did you see her child upstairs?
>
> Nichols: Yes. There was a child in bed asleep. And she was on the telephone when I got upstairs and I told her—
>
> Holland: Did she tell you who she was on the phone with?
>
> Nichols: No, she didn't say. And I told her to put the phone down. And I took her down the stairs to the living room and that's where–she had on like a nightgown type thing, and I tore it off and I proceeded to have sexual intercourse with her, and—

As to P.G., another case that was tried, the petitioner had also made a detailed statement to Captain Holland, which was read to the jury during the trial.[3] A portion of that statement is as follows:

> Nichols: Yeah. I entered through the front door which was unlocked. All I did was just open it.
>
> Holland: Did you have any idea that it was open?
>
> Nichols: No, I didn't.
>
> Holland: How did you know that she lived by herself?
>
> Nichols: I had seen through a window and I entered through the front door. And I went in and I believe I picked up a knife from the kitchen in this house. And a woman was in there asleep on the couch.
>
> Holland: In the bedroom or den?
>
> Nichols: The living room.

---

[3]This statement is in addition to the one to Captain Holland made by the petitioner shortly after his arrest.

Holland: Okay.

Nichols: It might have been what you might refer to as a den or something cause I went through one bedroom into the kitchen. And I woke her up there on the couch and then told her to go to the bedroom, and we did. And I believe I cut her top off of her. She had on kind of like sweat pants or something like that, and I pulled them off. And that's where I had sexual intercourse with her.

Holland: Forcibly, is that right?

Nichols: That's right, there on the bed.

Holland: And you did not ejaculate inside of her. Do you recall where you did ejaculate?

Nichols: I believe it was up on – I believe it was on her face.

Holland: Okay. Okay, and then what did you do, or what did you tell her to do?

Nichols: Well, I told her to go get in the shower.

Holland: Who turned the shower on?

Nichols: I did.

Holland: Okay.

Nichols: And while she was in the shower, that's when I left.

Holland: Okay. And did you go out the back door?

Nichols: I believe I went back out the front door.

A number of the rape victims identified the petitioner, either by viewing his photo, by seeing him in court, or both. In the two noncapital cases that were tried, he was identified in court by both of the victims, P.G. and P.R., as their assailant. As to the charges for the rape of S.T., which were resolved by guilty pleas, the transcript of the guilty plea hearing contains the statement of the prosecutor that S.T. picked a photograph of the defendant as the man who raped her. Additionally, according to the prosecutor, East Ridge police officers took the petitioner to the apartment complex where S.T. lived, and he pointed out her apartment. Apparently, the record does not indicate whether the petitioner was identified by T.R., the other matter which was resolved by pleas of guilty and

-13-

which is the subject of a post-conviction petition. As to the additional five cases in which the petitioner entered pleas of guilty and which are not questioned by a post-conviction petition, it appears that the petitioner was identified by photograph by the victims, T.M., A.P., and C.B. It appears that D.L. did not identify him, and the record does not reflect whether an identification was made by T.H.

## POST-CONVICTION HEARING

A number of witnesses testified at the consolidated evidentiary hearing on Nichols's post-conviction petitions. The substance of their testimony will be discussed in relevant portions of this opinion. The State called the petitioner as a witness. However, prior to the petitioner's being called, post-conviction counsel had asserted in a memorandum that the petitioner had a privilege against self-incrimination at the post-conviction hearing and that state law did not require that he testify. The post-conviction court ruled that, although the petitioner did not have a privilege against self-incrimination at the hearing, the court would not require him to respond to incriminating questions from the State. Accordingly, other than to provide basic biographical information, the petitioner refused to answer any of the State's questions regarding the offenses themselves, asserting a Fifth Amendment privilege.

## SCOPE OF REVIEW

The findings of fact of the post-conviction court are conclusive on appeal, unless the evidence preponderates against the findings, see State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999) (citing State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998)); and the appellate court cannot "reweigh or reevaluate" the evidence. Id.; see also Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997), cert. denied, 525 U.S. 830, 119 S. Ct. 82, 142 L. Ed. 2d 64 (1998). However, the appellate court's review of the application of the law to the facts is *de novo*, without a presumption of correctness. See Burns, 6 S.W.3d at 461; Harries v. State, 958 S.W.2d 799, 802 (Tenn. Crim. App.), perm. app. denied (Tenn. 1997). Additionally, issues as to whether counsel was ineffective and whether prejudice resulted are mixed questions of law and fact. Burns, 6 S.W.3d at 461 (citing Goad v. State, 938 S.W.2d 363 (Tenn. 1996)).

The petitioner's original post-conviction petition in the capital case was filed on April 20, 1995, and is therefore controlled by Tennessee Code Annotated Section 40-30-101 to -124 (repealed). Accordingly, the petitioner must prove the allegations contained in this petition by a preponderance of the evidence. See State v. Kerley, 820 S.W.2d 753, 755 (Tenn. Crim. App.), perm. app. denied (Tenn. 1991); Oliphant v. State, 806 S.W.2d 215, 218 (Tenn. Crim. App.), perm. app. denied (Tenn. 1991).

The petitioner's post-conviction petitions in his noncapital cases were filed on December 18, 1996, and are therefore governed by the Post-Conviction Procedure Act. Tenn. Code Ann. § 40-30-201-222. The petitioner must establish the factual allegations contained in his noncapital petitions by clear and convincing evidence. Tenn. Code Ann. § 40-30-210(2)(f).

-14-

**ISSUES**

**I. Ineffective Assistance of Counsel**

**A. Applicable Law Regarding Ineffective Assistance of Counsel**

Each of the petitioner's first eight assignments of error are based upon his claim that he received ineffective assistance of counsel. This claim is specifically raised with respect to the petitioner's entry of guilty pleas to the capital murder and to other noncapital offenses, as well as to counsel's representation of the petitioner during the sentencing phase of his capital trial.

In elaborating upon the requirement that an accused is entitled to constitutionally effective assistance of counsel, the United States Supreme Court, in Strickland v. Washington, 466 U.S. 668, 686, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984), stated that the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." The Tennessee Supreme Court has often recited the two-prong test set forth in Strickland to be applied to ineffective assistance claims:

> To prevail on a claim of ineffective counsel in this proceeding, the appellant must prove by a preponderance of the evidence that the advice given or services rendered by his counsel fell below the range of competence demanded of attorneys in criminal cases. Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). He must also demonstrate prejudice by showing a reasonable probability that but for counsels' error, the result of the trial proceeding would have been different. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984); Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996).

King v. State, 989 S.W.2d 319, 330 (Tenn. 1999).

Specifically, the courts have been counseled against overdependence on hindsight in assessing counsel's performance. In fact, courts must be "highly deferential":

> A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the

-15-

challenged action "might be considered sound trial strategy."  See
*Michel v. Louisiana*, 350 U.S., at 101, 76 S. Ct., at 164.

Strickland, 466 U.S. at 689, 104 S. Ct. at 2065; see also Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982) (holding that counsel should not be measured by "20-20 hindsight").  Appellate courts must recognize that "[t]here are countless ways to provide effective assistance in any given case" and that "the best criminal defense attorneys would not defend a particular client in the same way." Strickland, 466 U.S. at 689, 104 S. Ct. at 2065.

Other cases make clear the showing which must be made as to the criticized defense.  See Chandler v. United States, 218 F.3d 1305, 1315-16 (11th Cir. 2000), petition for cert. filed (U.S. Oct. 19, 2000) (citing Waters v. Thomas, 46 F.3d 1506, 1512 (11th Cir. 1995) (en banc)) ("[T]o show that the [lawyer's] conduct was unreasonable, a petitioner must establish that no competent counsel would have taken the action that his counsel did take."); Provenzano v. Singletary, 148 F.3d 1327, 1332 (11th Cir. 1998) (noting that conduct of counsel is unreasonable only upon a showing "that no competent counsel would have made such a choice").

Further, the reasonableness of counsel's decision not to investigate possible defenses is affected and guided by the client's own statements or actions:

> In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.
>
> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions.

Burns, 6 S.W.3d at 462 (citing Strickland, 466 U.S. at 691, 104 S. Ct. at 2066).

The Strickland court explained that the need to further investigate a particular line of defense "may be considerably diminished or eliminated altogether," depending upon information supplied by the client to counsel.  Strickland, 466 U.S. at 691, 104 S. Ct. at 2066.  "In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions."  Id.

In each of the petitioner's cases under review by this court, he had initially given multiple confessions to law enforcement officials and had confessed to both trial counsel and to their investigator.  He testified during the penalty phase of the Karen Pulley trial as to his guilt.  He admitted his guilt to Karen Pulley's mother and subsequently to his uncle, who testified to that fact during the post-conviction hearing.  Although he has not claimed to have recanted these statements, he has asserted in writing, in his post-conviction petition, that counsel were ineffective for not investigating whether these were "false" confessions.

-16-

As previously stated, during the post-conviction hearing in these matters, the State called the petitioner as a witness. Earlier, counsel for the petitioner had filed a memorandum of law, asserting that the petitioner had a privilege against self-incrimination. The court ruled that the State could call the petitioner as a witness, but that the court would not compel him to testify if he asserted his Fifth Amendment privilege.

After he was called to the witness stand, the petitioner responded in the following fashion to the State's questions:

> Q. For the record could you state your full name?
>
> A. Harold Wayne Nichols.
>
> Q. All right. Mr. Nichols, in September of 1988 could you tell us where you were living?
>
> A. I was living on Donaldson Road.
>
> Q. All right. Specifically on September 30th of 1988, could you tell us about the events of that evening, where you were and what you did?[4]
>
> . . . .
>
> A. Under the Fifth Amendment I refuse to answer that question.
>
> Q. All right. So you refuse to answer the question what were you doing on the evening of September 30, 1988?
>
> A. That's correct.
>
> Q. Do you know Karen Pulley?
>
> . . . .
>
> A. I'm going to refuse on grounds of the Fifth Amendment.
>
> Q. So the question was do you know Karen Pulley and you're going to refuse to answer it on the grounds it may incriminate you?

_____

[4]This is the date that Karen Pulley was raped and murdered.

-17-

A. Under the Fifth Amendment, yes.

Q. All right. Are you going to answer any questions I have today?

A. None of the ones I've answered.

Q. Okay. Do you know [S.T.]?[5]

A. I refuse to answer on the ground it may incriminate me.

Q. Okay. All right. So if I ask you any questions involving any of the names of the women that you pled guilty to raping will you answer any of those questions?

A. I refuse to answer on grounds it may incriminate me.

Q. All right. Let's try to go to something that's a little easier for you to talk about, do you know Claude Nichols?

A. Yes, I do.

Q. All right, who is Claude Nichols?

A. He's my uncle.

Q. Okay. And he's your father's brother?

A. That's correct.

Q. And were you in court when Claude Nichols testified?

A. I was.

Q. Okay. And that was June of this year, do you remember that?

A. Yes.

. . . .

Q. You heard him testify in court, right?

---

[5] On October 24, 1989, the petitioner had pled guilty to the aggravated rape, petit larceny (reduced from grand larceny), and first degree burglary complaints of S.T.

A.   I did.

Q.   And you heard him testify that he asked you, "Wayne, did you do that," referencing the murder, and your answer to him was yes, is that the truth, Wayne?

A.   I refuse to answer on grounds it may incriminate me.

Q.   Did your uncle perjure himself here in court?  Did he lie about you telling him that you murdered Karen Pulley, and raped Karen Pulley?

A.   I refuse to answer on grounds it may incriminate me.

Q.   Do you know Dr. Solovay?

A.   I do.

Q.   Okay.  Who is Dr. Solovay?

A.   Dr. Solovay is a psychologist.[6]

Q.   Okay.  And you heard Dr. Solovay, the fact is Dr. Solovay conducted an examination of you in March of this year, March of 1997, is that correct?

A.   That's correct.

Q.   All right.  Did you participate in that examination?

A.   I did.

Q.   And did you answer his questions truthfully and accurately?

A.   I refuse to answer that on the grounds it may incriminate me.

---

[6]Dr. David A. Solovay was a clinical psychologist retained by post-conviction counsel for forensic consultation as to the petitioner.  Dr. Solovay stated in his report that "7) Mr. Nichols has sorrow, remorse and a sense of personal guilt for his crimes, 8) Mr. Nichols acknowledged his wrongdoing at an early stage of the arrest.  He was cooperative with the police and accepts responsibility for his wrongdoing.  9) Mr. Nichols has expressed willingness to plead guilty to the crime."  During the hearing, Dr. Solovay testified that the petitioner admitted his guilt for the rapes and for the murder of Karen Pulley.

Q. The question of whether you answered Dr. Solovay's questions truthfully and accurately, you're not going to answer that?

A. That's correct.

. . . .

Q. Okay. I'll rephrase it. Did you tell Dr. Solovay that you took responsibility for the rape and murder of Karen Pulley?

A. I refuse to answer on grounds it may incriminate me.

. . . .

Q. And do you remember in your discussions with [junior trial counsel] that you told her that you, in fact, committed the rape and murder of Karen Pulley?

A. I refuse to answer that on grounds it may incriminate me.

Q. Okay. And is that equally true for the other 41 charges that you were indicted on in 1989?

A. I refuse to answer that on grounds it may incriminate me.

Q. Okay. So you will not answer any questions about any of the 41 charges if I ask you about them?

A. I refuse to answer on grounds it may incriminate me.

. . . .

Q. [A]ll right. Do you have any problems with the investigation of Detective Heck and how he took this confession from you?

A. I refuse to answer on the grounds it may incriminate me.

. . . .

Q.   Okay.  With Richard Heck, you took him out and showed him the 2-by-4 on Missionary Ridge.  Can you tell us about how that happened?[7]

A.   I refuse to answer on grounds it may incriminate me.

Q.   Okay.  And with the actually going out to Karen Pulley's house, the log was outside the window, you pointed that out and showed that to him, would you tell us about those facts and circumstances?

A.   I refuse to answer on grounds it may incriminate me.

Q.   You understand that this is your post conviction hearing?

A.   I understand that.

Q.   Okay.  And you have the right to give testimony regarding that post conviction hearing?

A.   I have the right to, yes.

Q.   Okay.  And you understand that this is the only opportunity I have to ask you questions about the rape and murder of Karen Pulley and the other rapes that form the aggravating circumstances underneath your death penalty?

A.   Yeah, I understand it.

Q.   Okay.  And at this time your position that you're taking with the advice of one, two, three attorneys is that you will not answer any questions from the state about those charges?

A.   That's correct.

We have reviewed the petitioner's memorandum of law filed with the post-conviction court asserting that he had a right to remain silent at the post-conviction hearing.  The question is not whether applicable post-conviction statutes require that he testify to make out his claims, although he must be concerned about this because he bears the burden of proof.  Rather, the issue is whether

---

[7]On January 7, 1989, the petitioner had gone to this location with Sergeant Richard Heck where they found at the base of a tree a two-by-four which the petitioner stated "look[ed] like" the one he had thrown out of his car following the attack on Karen Pulley.

he had a Fifth Amendment right against self-incrimination, thus precluding his being questioned by the State.

It is clear that the State was entitled to call the petitioner to the witness stand and question him during the post-conviction hearing. His convictions had become final years earlier, and, consequently, he no longer had a privilege against self-incrimination. As explained in State v. Barone, 986 P.2d 5 (Or. 1999), cert. denied, 528 U.S. 1086, 120 S. Ct. 813, 145 L. Ed. 2d 685 (2000):

> [T]he question before us is whether a witness, who has been convicted of a crime and has exhausted his direct appeals from that crime, nevertheless possesses a privilege against self-incrimination and may refuse to answer questions about the crime, if he intends at some time in the future to attack his conviction through post-conviction or habeas corpus proceedings. We conclude that a witness does not possess a privilege against self-incrimination under those circumstances. The Fifth Amendment privilege against self-incrimination protects witnesses from the danger of exposing themselves to criminal liability. The privilege applies where the risk of self-incrimination is "real and appreciable," not "remote and improbable." Here, Darcell's asserted risk of self-incrimination was neither "real" nor "appreciable," because at the time when he claimed the privilege, Darcell already had been convicted of the charge for which he feared prosecution. He could not incriminate himself further by answering questions about a crime for which he already had been convicted and sentenced and for which his direct appeals were exhausted. Mitchell v. United States, 526 U.S. 314, 119 S. Ct. 1307, 1314, 143 L. Ed. 2d 424 (1999) ("It is true, as a general rule, that where there can be no further incrimination, there is no basis for the assertion of the privilege. We conclude that principle applies to cases in which the sentence has been fixed and the judgment of conviction has become final."); Reina v. United States, 364 U.S. 507, 513, 81 S. Ct. 260, 5 L. Ed. 2d 249 (1960) (citing "weighty authority" for the proposition that, "once a person is convicted of a crime, he no longer has the privilege against self-incrimination as he can no longer be incriminated by his testimony about said crime . . . .").

Id. at 20-21.

The Alabama Court of Criminal Appeals, in State v. Click, 768 So.2d 417 (Ala. Crim. App. 1999), cert. denied, ____ U.S. ____, 121 S. Ct. 92, 148 L. Ed. 2d 52 (2000) (citing Mitchell v. United States, 526 U.S. 314, 119 S. Ct. 1307, 143 L. Ed. 2d 424 (1999), and Barone), ruled that an inmate, whose conviction and sentence had been affirmed on direct appeal, had no Fifth Amendment

-22-

privilege against self-incrimination in a hearing on his petition for post-conviction relief attacking his conviction.

In Bryan v. State, 848 S.W.2d 72 (Tenn. Crim. App.), perm. app. denied (Tenn. 1992), the petitioner had claimed in his post-conviction petition that his guilty pleas were not voluntarily, knowingly, and intelligently entered. However, both he and his attorney declined to testify as to their pre-guilty plea conversations, citing attorney-client privilege. This court denied that the privilege applied to the situation, noting first that there was "no blanket prohibition against the state even calling the petitioner as a witness to prove that the guilty pleas were, in fact, voluntarily, knowingly and understandingly entered." Id. at 79. The court then explained the relevance of such testimony:

> The petitioner's intelligence, education, previous history with the criminal justice system, including evidence of his previously being advised of the pertinent constitutional rights, and anything else which would bear on the petitioner's understanding of his rights would be relevant. The state is entitled to a fair opportunity to present such evidence.

Bryan, 848 S.W.2d at 79.

The court concluded that because of the issues raised by the post-conviction petition regarding the petitioner's knowledge of his rights and consequences of the plea, an implied waiver of the attorney-client privilege was appropriate, upon a "showing that the information possessed by the trial attorney was vital to [the state's] defense in the post-conviction action." Id. at 81. The court detailed the rationale for its ruling:

> A post-conviction case is not a criminal prosecution, but is a means to address a petitioner's allegations of constitutional wrongdoing in a previous convicting or sentencing process. However, once a petitioner alleges and seeks to prove constitutional error, the state should be entitled to prove the absence of such error. Fairness in the judicial process demands no less.

Id.

Here, it is clear that there was no privilege which protected the petitioner from being called to testify at his post-conviction hearing. Additionally, Tennessee law did not prevent the State's calling the petitioner as a witness.

One of the authorities upon which the petitioner relies in the post-conviction memorandum regarding his testifying is not helpful to his assertions. The petitioner is correct that in Teague v. State, 772 S.W.2d 932 (Tenn. Crim. App. 1988), perm. app. denied (Tenn. 1989), the court concluded that even though the petitioner elected not to testify during the post-conviction hearing,

there was sufficient evidence in the record that the petitioner would not have entered a plea of guilty or *nolo contendere* if he had known that it could be used as an aggravating circumstance in a capital case in which the petitioner was subsequently convicted and sentenced to death. However, in that matter, petitioner's trial counsel, whose competency was being questioned, testified during the post-conviction hearing that the petitioner, upon learning of the use to which the State could put the guilty plea, immediately wanted to know why counsel had let him enter the plea. Counsel also testified that his advice regarding the plea was "[t]he worst [advice] I ever gave anybody." Id. at 935.

While Teague establishes that, under certain circumstances, ineffective assistance of counsel can be established other than through a petitioner's testimony, it does not touch upon whether the State can call a petitioner to testify during a post-conviction hearing. Here, petitioner's trial counsel strongly disagreed that their trial decisions had not been appropriate under the circumstances or that they had provided ineffective assistance of counsel in any way. Accordingly, this petitioner cannot rely, as occurred in Teague, upon his trial counsel, themselves, to establish ineffective assistance of counsel.

Further, the court in Teague recognized that an adverse inference can be drawn when a petitioner, as a "missing witness," does not testify during the hearing. The court noted that, as to Teague himself, the inference was "greatly diluted in strength, if not explained away," by the facts that trial counsel's deficient performance had been otherwise established and that the petitioner's post-conviction hearing testimony could be used against him in a subsequent retrial of the charges. Id. at 940.

Based upon these authorities, we conclude that the petitioner had no basis to refuse to answer the questions asked of him by the State during the hearing on his post-conviction petitions. Additionally, we conclude that an adverse inference could have been drawn because of the petitioner's refusal to answer questions of the State. Although this petitioner, like that in Teague and others seeking post-conviction relief from a conviction, may not have wished to make statements which could be used against him in a retrial, that fact is not sufficient to avoid an adverse inference resulting from a refusal to testify. Here, the issue of ineffective assistance of counsel was highly contested and not conceded by trial counsel, as occurred in Teague. Our efforts to ascertain whether a "just result," as envisioned by Strickland, was achieved were hampered by the petitioner's unjustified dependence upon the Fifth Amendment.

## B. Petitioner Received Ineffective Assistance of Counsel at the Guilt Stage

The petitioner first argues that trial counsel were ineffective for their general failure to adequately investigate his charges when a competent investigation would have led them to the discovery of evidence of his innocence in some cases and to question the validity of his confessions to the various offenses. The petitioner's specific allegations may be generally separated into claims that counsel failed to adequately investigate and/or analyze evidence of his innocence in the rape and murder of Karen Pulley and two other rape cases, and that counsel failed to analyze evidence demonstrating that the petitioner's confessions in these cases and the ones in which he pled guilty

were "false." The petitioner argues that competent trial counsel would have used the information discovered through a proper investigation to recommend that the petitioner go to trial. Instead, according to the petitioner, trial counsel's advice to plead guilty was uninformed due to the lack of independent investigation and analysis of all the available evidence and records.

### 1. Trial Counsel Failed to Analyze Evidence Demonstrating the Petitioner's Confessions Were Unreliable

Because, as explained in Strickland, the responsibility of trial counsel to investigate possible defenses is affected by what the petitioner told counsel about the offenses, we will first examine the petitioner's claim that counsel were ineffective for not investigating whether his confessions were false.

The petitioner presented proof to support his contention that his confessions bore indicia of unreliability that should have alerted his trial counsel to question their validity. He presented the deposition testimony of Dr. Richard J. Ofshe that counsel should have investigated his confessions to determine if they were false. He presented proof during the post-conviction hearing that the two-by-four, presumed to be the Karen Pulley murder weapon, could not have been so. He presented testimony that business records showed that he was at work at the time of one of the rapes to which he pled guilty, but which is not the subject of collateral attack, and that this fact, as competent counsel would have recognized, should have shown that all of his confessions were false. He claimed that a pistol relied upon by the prosecution as proof as to the aggravated rape, grand larceny, and first degree burglary indictments in which S.T. was the victim and to which he pled guilty, was of a different type than that identified by the victim. He referred to serology tests, the results showing, according to the petitioner, that he did not commit several of the offenses to which he pled guilty. We will consider each of these claims.

First, in assessing the petitioner's claims as to his confession in the Karen Pulley case, we note that the supreme court, on direct appeal of the sentencing in that case, determined that the petitioner's confession was voluntary and therefore admissible. Nichols, 877 S.W.2d at 732. The court observed that the trial court's ruling on the statement's admissibility was supported by evidence that the petitioner was read and waived his Miranda rights and that the trial court credited the testimony of officers that disputed the petitioner's contention that he was coerced into confessing. Id. We are bound by the supreme court's determination of this issue. An issue has been previously determined "if a court of competent jurisdiction has ruled on the merits after a full and fair hearing." Tenn. Code Ann. § 40-30-206(h).

We will now review the statements of the petitioner, because the reasonableness of trial counsel's advice not to pursue a "false" confession defense, but instead to recommend pleas of guilty as to certain of the charges, "may be determined or substantially influenced by the defendant's own statements or actions," to which decision we apply "a heavy measure of deference to counsel's judgments." Strickland, 466 U.S. at 691, 104 S. Ct. at 2066.

The lengthiest statement of the petitioner regarding the offenses with which he was charged appears to have been that made regarding the Karen Pulley murder to Sergeant Richard Heck, which was videotaped and is a part of the appellate record. The videotaped statement is somewhat over an hour in length and records the conversation of the petitioner and Sergeant Heck while both were seated at a desk. To many of the questions, the petitioner provided long, detailed narrative responses. The petitioner volunteered to do so and then drew a diagram of the area of Karen Pulley's house, showing where cars were parked, the route he took to her house, and his point of entry into the house. Sergeant Heck provided a floor plan of the first level of the house, and the petitioner detailed the path he took through that level, marking where the victim's purse was located. On a drawing of the upstairs, where he confronted the victim, the petitioner explained the layout and the location of the victim's bed, where he raped and then beat the victim with a two-by-four. The petitioner then used the diagrams to explain in detail the route he took after the attack. The tone of the statement was conversational and friendly. However, as the petitioner told of the rape and beating of Karen Pulley, he became visibly upset and his voice broke. Based upon our review of this tape, we conclude that it would have had a powerful effect upon a jury deciding the guilt or innocence of the petitioner as to the charges that he raped and murdered Karen Pulley. Also, the petitioner told Sergeant Heck where he had disposed of the two-by-four which he used to beat Karen Pulley and accompanied Heck to the location where the two-by-four was recovered.

The petitioner also confessed to the charges brought against him by P.G. and P.R., all of which were tried and resulted in verdicts of guilty. Each confession, excerpts from both of which were previously set out in this opinion, was related to the respective juries during the trials by Captain Holland. The petitioner did not testify during either of these trials. Additionally, the record contains a series of short confessions as to the victims D.L., P.G., P.R., and S.T., as well as offenses in Tiftonia and a rape and an attempted rape in Red Bank.

During their testimony at the post-conviction hearing, the petitioner's trial counsel testified as to how they assessed the petitioner's confessions to law enforcement authorities, as well as to them. As for an investigation, in addition to meeting with the petitioner, senior trial counsel testified that he read the files and the interviews and visited some, if not all, of the crime scenes. Their investigation of the facts showed that the petitioner was not guilty of one of the rapes, and they were successful in having that charge dismissed. Senior counsel described the videotape, in which the petitioner confessed to raping Karen Pulley, as "emotional." He testified that based upon "lot[s] of conversations" that they had with the petitioner, it "seemed to be a waste of time" to investigate whether someone else had attacked Karen Pulley:

> We had a lot of conversations with Mr. Nichols and based on those
> conversations and based on our work on the case that did not seem
> like a fruitful line of inquiry. If I for a minute had thought that
> someone else had raped and killed Karen Pulley, I would have gone
> after that tooth and nail.

He acknowledged that if a client's statement does not "match 100 percent" with the facts of the case, counsel must exercise judgment regarding the extent to which the statement must be investigated:

> It's based on my judgment, it's based on my judgment that you spend time going down trails that appear to lead somewhere and that you don't spend time going down trails that appear don't [sic] to lead anywhere and that the trail that someone else attacked Karen Pulley didn't appear to – I won't speak for [junior trial counsel], didn't appear to me to lead anywhere.

He testified that, as a general rule, if there was "enough that didn't match [he] would've considered bringing it to the jury's attention, yes."

Senior counsel said that there was nothing he recalled "in any of the many conversations that [junior counsel] and [he] had with [the petitioner] that led [them] to question the confession" as to Karen Pulley. When they were unsuccessful in quashing the statement, their only options were then "to attack the statement in some way" or to do what they did, which was to present a "mitigation case." Senior counsel testified that there was no indication to either him or junior counsel that the petitioner's "statements were not based in fact."

Junior trial counsel for the petitioner testified regarding her conversations with him. She was familiar with the tape-recorded confessions that he had given to law enforcement officers and believed that, in their questions, officers tried to lead the petitioner into making statements which would "incense" the jury. She said that she met with the petitioner and he "verified all of [the] facts" of the charges against him. She did not lead him in the recounting of the incidents but "would either prompt him by the address or by something that would make him remember which case" they were talking about. The petitioner's "recollections were very vivid." She said that her client would not admit to "some things" but that "on everything else it was very consistent with some small exceptions on the police reports." She testified that the petitioner "had told me in great detail that he had done each of these crimes."

Counsel was asked if she considered whether his confessions might be false and if her "mind rest[ed] easily" that this was not the case. She replied:

> Yes. In fact, one of the things that Wayne and I talked about was the fact that the confessions, some of them and some parts of them were so detailed, that they were things, you know, that only he and/or the victim would know, and we talked about that and, as I said, Wayne is smart. You know, he's got a good memory and they were very detailed.

As to presenting a defense that the confessions were false, she said that "after investigating this case thoroughly we decided that was a ludicrous defense," unless they had "wanted to manufacture a defense."

Michael Cohan, the investigator retained by petitioner's appointed trial counsel, also testified during the hearing. Formerly, he had been a military police officer for four years, a University of Tennessee police officer for two years, and a Knoxville narcotics officer for about five years. After being the assistant regional director for investigations for the Department of Human Services Welfare Fraud Division, also for about five years, he had become a private investigator in 1986.

He talked "extensively" with the petitioner, the first meeting occurring on May 19, 1989. Cohan made detailed notes of his meeting with the petitioner, the notes being introduced as an exhibit in the post-conviction hearing. The petitioner told Cohan about the attack on Karen Pulley:

> Wayne insists that Karen Pulley's house was chosen totally at random. He said that when he got restless he didn't like to sit around and he'd just go out and drive around. He said he was just driving by and saw that there was only one light on. He said that he saw two cars in the driveway, looked through the window, saw one girl getting dressed, saw her leave, and when he came around and she was gone, he assumed there was nobody there. He said his sole purpose in going into the house was burglary.
>
> He said that while the house is two story, he thought it only looked like it was a two story [sic] house. He explained that his father's house appears to be a two story house, but it is truly just a one story house. He said he went in and he was looking around and it was only then that he saw the steps. [He told me pretty much what he told Heck. I'm not going into a lot of redundant detail.] [brackets in original]
>
> Wayne said he saw her pocketbook on the back of the couch and went through it. He's not sure whether he took some cash out of it or not. He said he wouldn't have messed with checks or credit cards.
>
> At any rate, he went up the steps. When he got up the steps he saw the girl sitting up in bed. Wayne then stopped and said "I didn't even tell Heck this part." He went on to say that the girl didn't scream. Said she looked at him and said "which one are you?" [That ends the part that he didn't tell Heck.] [brackets in original]. He said he responded for her not to worry about it. He said that he didn't go there with the intent to rape her that it just "came up." He reiterated that the majority of the damage was done as she clung to him as he

-28-

was trying to get away from her and leave. I asked him if it was true that he put a pillow under her head and he said he didn't remember exactly. He said, I remember that I "got something off the bed." He said he wasn't real sure what it was or what he did with it. At any rate, he said he then exited by the back door.

Wayne said, as he had earlier said to [junior trial counsel] in front of me, that he didn't think he killed the girl. I asked him why that was and he said there were wounds on her body that he didn't do. We got the diagram out and he was specifically talking about what I believe is a tracheotomy site obviously on her throat. He also pointed out the punctures in her arms and I explained to him our belief from reading the autopsy that those were intravenous cites [sic].

He said that he was also disturbed with some of the things they found in the house. He said there was something about the telephone being pulled out of the wall and that he had never touched the telephone. He said that the police were very inquisitive regarding the movement of a chair in the living room, a T.V. in the living room and something in a hallway that had been placed on a stand. He said he never messed with anything like that. He believes from the insistence of the police questioning that they thought there had been significant movements of all these items.

At the conclusion of the Karen Pulley trial, apparently just after the death penalty had been imposed, trial counsel were advised that the victim's mother wished to speak with the petitioner. In her post-conviction testimony, junior trial counsel explained what then occurred:

A. We talked to Wayne about – and I had no idea what Mrs. Pulley wanted to talk about and was surprised that she did want to talk to him. And, you know, explained that anything he said to her or so on, anything that happened in this meeting could be used later, you know, at some potential hearing or retrial or whatever, and that it was just fraught with a lot of problems, but Wayne wanted to talk to her.

And, so [senior trial counsel] and me and Mrs. Pulley and Wayne met in the little anteroom of Judge Meyer's courtroom. And it was probably as emotional a thing as I'd ever been a part of. And I thought – well, I thought everybody involved was, I guess, sort of brave or something, but Mrs. Pulley in particular, and Wayne. They talked, and I don't remember anybody's exact words, but Wayne apologized over and over for what he had done to her daughter, and she was very gracious and wonderful and talked to him a little bit

about the scriptures and God and forgiveness, and the difference between death and eternal death and I thought was really making an effort based on her religious beliefs to sort of save this kid's soul. It was very moving and it was very – it was just very interesting.

Q.   (By Mr. Davis)  And he acknowledged to her and in his words his responsibility for her daughter's death?

A.   Yeah, I mean I don't – you know, again, I don't recall that he said – you know, I don't recall his specific words, but, yes, he – I think it was somewhat of a relief to Wayne was the feeling I had too. And, like I said, I thought it was a really – I wouldn't have been able to do it under her circumstances but I thought it was a very brave thing for her to do and for Wayne to do.

Additionally, the petitioner's uncle, Claude Nichols, testified during the post-conviction hearing that, following the Karen Pulley trial, he had visited the petitioner in prison. Regarding the crimes, he asked the petitioner, "Wayne, did you do that?" and the petitioner answered, "Yes."

Thus, prior to the trial as to Karen Pulley, in addition to his confessions to police officers, the petitioner told both of his court-appointed attorneys, as well as their investigator, of his responsibility for the crime. He testified as to his responsibility during the sentencing phase of the trial. Later, he reaffirmed his guilt to his uncle and to Karen Pulley's mother.

Dr. Richard Ofshe, whose video deposition was presented as part of the petitioner's proof during the post-conviction hearing, is a professor at the University of California who teaches and does research in the areas of social psychology and extreme forms of influence. He is the holder of a B.A. and M.A. in psychology and a Ph.D in sociology. During his deposition, he discussed, generally, false and coerced confessions. Dr. Ofshe did not meet with the petitioner. However, he had reviewed the "series of transcriptions of short statements" by the petitioner regarding the various charges, as well as the petitioner's statements regarding the rapes of P.R. and S.T. In addition to other materials, he had reviewed the interview notes of the trial counsel's investigator and, apparently, the videotape of the confession as to the murder of Karen Pulley.

Dr. Ofshe opined that there appeared to be no investigation of either "how the statements came about" or whether they "should qualify as reliable statements." He stated that the lack of physical evidence was a factor as to why the statements should have been investigated. He did not find any evidence that the petitioner was "debriefed" by his trial attorneys regarding the various statements. Dr. Ofshe discussed certain testimony of the petitioner from the suppression hearing which he considered to be important. For instance, Dr. Ofshe considered it significant that the petitioner testified that he was told by officers that he would receive "treatment" in exchange for cooperation. He felt that trial counsel should have investigated how this subject came up. Dr. Ofshe testified that trial counsel should have determined if this subject was brought up to obtain an

admission from the petitioner. He said that trial counsel should have also discussed with the petitioner his conversation with officers regarding an attorney and whether his request was neutralized. They should also have debriefed the petitioner as to how he was "rehearsed" prior to the statement's being recorded. Dr. Ofshe testified he found it to be "astounding" that there was not any physical evidence linking the petitioner to the crimes. This fact, according to Dr. Ofshe, "should have signaled to his attorneys there's a possibility, a distinct possibility he may be innocent of some or all of these crimes." These factors, Dr. Ofshe testified, are "the absolute minimum in dealing with a confession case," and unless they were all looked at, an attorney could not competently advise a client as to what to do. Dr. Ofshe further stated that there were fewer resources available for the attorney, as to evaluation of a confession, in 1989 than there were in 1997, when his deposition was taken.

In addition to Dr. Ofshe's testimony, the petitioner makes further arguments as to why trial counsel should have questioned his confessions. He claims that the first series of statements, in which he confessed to five aggravated rapes and related charges, took only six minutes; that certain coercive tactics were utilized; that there were discrepancies between his statements and the incident reports regarding certain of the crimes; that he was unable to give any details of the incidents which had not already been included in police reports; and that a number of the "facts" of which he advised officers were inconsistent with the crime scene reports.

Additionally, the petitioner points to certain scientific proof or reports, which, he argues, should have alerted trial counsel of his actual innocence.

### a. Serology Evidence

The petitioner argues that counsel failed to review serology evidence which positively excluded him as the rapist, and thus the murderer, of Karen Pulley, and which also excluded him as the rapist in the T.R. case, the latter being significant for its use as an aggravator in the capital case. The petitioner relies upon a May 19, 1989, Tennessee Bureau of Investigation ("TBI") Crime Laboratory report of forensic scientist Joe P. Minor, in which Mr. Minor sets out his conclusion as to vaginal and saliva cotton swabs from the rape evidence kit collected from Karen Pulley, which the TBI Lab had received from Dr. F. K. King, the Hamilton County Medical Examiner. According to that report, a glass slide revealed the presence of spermatozoa but the typing test for the vaginal swab "failed to indicate the presence of A, B or H antigens." Based upon these results, coupled with the fact that the petitioner was a secretor, the petitioner contends he was excluded from the class of males who could have committed the Pulley rape. Junior trial counsel testified that she was familiar with the serology report of Mr. Minor and had probably talked to him by telephone, although it is possible that she discussed it, instead, with the prosecutor.

Similarly, with respect to the rape of T.R., the petitioner contends that counsel failed to make further necessary inquiry concerning the report of TBI serologist Mike VanSant. The petitioner contends that providing VanSant with further details of the T.R. rape would have given him the necessary information to enable him to change his "inconclusive" results in the testing of the semen

found in the vaginal swab to a conclusion that the petitioner was excluded as the rapist in the T.R. case. We will examine these contentions.

## Karen Pulley

Specifically, as to Karen Pulley, the petitioner claims in his appellate brief that a consideration of several of the exhibits together shows that he was not within the class of males who "could have raped Karen Pulley." Arguing that since A, B, and H antigens were not found on the vaginal swabs taken from Karen Pulley, and that since he was a Type O secretor, and his seminal fluid would have contained an H antigen, the petitioner's brief concludes:

> Therefore, the presence of spermatozoa on TBI exhibit 43B and the lack of A, B or H antigens on TBI exhibit 43D, demonstrates that the perpetrator of the crime was a non-secretor. Since, Nichols is a secretor he is excluded from the class of males who could have raped Karen Pulley. Since Ms. Pulley was a virgin prior to her rape and murder (Dr. King at PC T, Vol. X, 1363), the sperm and its necessarily accompanying semen had to have been the body fluid of the perpetrator, a non-secretor.

We do not agree that this necessarily is a valid conclusion. We note that no expert witness testified that the scientific evidence excludes the petitioner from the class of males, one of whom raped Karen Pulley. Post-conviction counsel called as a witness Mike VanSant who had formerly been employed as a serologist with the TBI Crime Lab and had done serology work on the T.R. and P.G. cases. He said that he had "briefly" reviewed that morning the lab results in the Karen Pulley case. In seeking to question him about those results, petitioner's counsel explained what she sought to establish through Mr. VanSant:

> Just that there were results in the Karen Pulley case that are consistent with the lab notes in the Karen Pulley case, several swabs were tested, no antigens were found on any swab that there were sperm found, no antigens.

Counsel for the State responded to this argument:

> Your Honor, the state's position very simply is Karen Pulley is a complicated serology case, you're talking about a woman who had a rape kit and then at the time of autopsy other slides were taken, serology was done, she had massive blood transfusions at the hospital that were not her blood type, it may not have been her exactly her

-32-

same antigen patterns. The serologist will be here tomorrow for us and will be available to testify.[8]

Petitioner's counsel then made more specific what opinion testimony she wished to obtain from Mr. VanSant: "Based on what Mr. Davis has just said I would like to ask him if blood transfusions make any difference in serology."

Through Mr. VanSant, petitioner's counsel established that "massive blood transfusions," such as those administered to Karen Pulley, could have affected blood samples taken from her, but not "vaginal swabs and saliva swatches." In her questioning, counsel later asked whether the results would be affected if the vaginal swabs were bloody; and there was the following series of questions and answers:

> Q. Is there a way to distinguish blood from semen? I mean, for instance, on the vaginal swab if you come up with a result – would the fact that it's bloody make any difference?
>
> A. No, on a vaginal swab if semen is present I'm dealing with a mixture of two fluids from two different people if semen is present in a vaginal swab.
>
> Q. Even if there's a lot of blood?
>
> A. That, I really couldn't answer. If there's a lot of blood, blood flow then yes, naturally it's going to have the cleansing action over a period of time.
>
> Q. Over a period of time, but just because there's a lot of blood, that doesn't hide the fact that there's semen there, that whatever antigens you would get from the semen?
>
> A. Not necessarily.

Mr. VanSant was not asked to further explain this response. Petitioner's counsel had earlier asked Mr. VanSant, referring to the rape of T.R., whether the fact that a woman was menstruating when she was raped would "change the serological results" on a test performed from a vaginal swab. Although in the above quoted testimony Mr. VanSant may have again been referring to the rape of T.R., this is unclear. A common sense reading of the transcript of his testimony appears to be that a substantial flow of blood from the vagina would have a "cleansing action over a period of time" which could affect antigens detectable in semen found on a vaginal swab. Dr. King testified that

_____

[8]No other serologists testified during the post-conviction hearing. A serologist did not testify for the State during the hearing.

Karen Pulley suffered a "traumatic rupture of the hymen" resulting in "multiple lacerations or tears and bruising of the complete circumference of the inner edge of the hymen." He testified that there was a lot of blood at the crime scene. The record is silent as to how extensive a blood flow there was from her vagina following the attack upon her and, consequently, whether it was sufficient to have a "cleansing effect" as to the presence of antigens. As set out in the supreme court's recitation of the facts as to Karen Pulley, she lay mortally wounded and apparently bleeding, but still alive, for a period of hours following the attack. Apparently, blood transfusions were administered as part of the effort to keep her alive.

In view of the testimony of Mr. VanSant and the limited explanation of the Joe Minor report, we conclude that the petitioner has failed to show that the results of the serology tests exclude him as the attacker of Karen Pulley.

### T.R.

The petitioner claims in his brief, as evidence of ineffective assistance of counsel, that results of scientific tests excluded him as T.R.'s rapist. We will examine the evidence in light of this claim.

First, we note that on September 13, 1989, the petitioner entered pleas of guilty to the burglary and aggravated rape of T.R. Prior to entry of the guilty pleas, the petitioner, in response to questions from the trial court, stated that he had told his lawyers all that he knew about the matter, and that he had no complaints about his attorneys. He told the court that based upon the State's proof, he believed that a jury would find him guilty of burglary and aggravated rape and that he was entering pleas of guilty for that reason.

As for the scientific proof, Mr. VanSant testified at the post-conviction hearing that both the petitioner and T.R. were O secretors who would secrete an H antigen. The proof was that T.R. had voluntary intercourse three days prior to the rape. Following the rape of T.R., a B antigen was found in saliva and vaginal swabs taken from T.R., and the B antigen could not have come from either the petitioner or T.R., according to expert testimony. Based upon this result, the petitioner asserts that he is excluded from the class of males who could have raped T.R.

Mr. VanSant further testified that he examined the bedspread from the bed where T.R. was raped and found seven areas which, when examined under a laser light, had an appearance consistent with the presence of semen or other bodily fluids. Upon testing a stain which was in the middle of the bedspread, he found sperm and the H antigen present. He stated that the H antigen could have come from T.R., who was an O secretor, the sperm being deposited by a nonsecretor, or that it could have been deposited by a male who was also an O secretor. Mr. VanSant testified that the petitioner was an O secretor and would secrete the H antigen in his body fluids. Thus, he could not exclude the petitioner as the source of the H antigen on the bedspread. There was no proof presented as to whether this stain occurred when T.R. was raped. In response to a question from the court, Mr. VanSant explained that he could say only that the B antigen could not have come from the petitioner. He could not say, however, whether the B antigen had come from the rapist or from a consensual

sexual partner with whom the victim had intercourse. He said that, in his opinion, "not much time had elapsed between the time of the intercourse and the time the swab was taken."

Relevant literature states that, utilizing tests such as those used by Mr. VanSant, the presence of antigens could be detected up to nine days after a sexual act. He testified he would not expect to be able to detect semen on an oral swab if it had been deposited three days earlier, when T.R. last had voluntary relations. His conclusion was that, although he could exclude the petitioner as having deposited the B antigen found in the saliva and vaginal swabs, he could not exclude him as being the rapist of T.R. because an H antigen, which could have come from the petitioner, was found on a stain on the bedspread.

Concluding his testimony, Mr. VanSant, responding to questions from the State as to whether the tests actually performed as to the T.R. rape, or any additional tests, could exclude the petitioner as the rapist, stated:

> Q. You keep talking about further testing. You could do this testing all day long and you could never exclude Harold Wayne Nichols because he has the same genetic makeup on this type of testing as a victim?
>
> A. As [T.R.], yes.
>
> Q. Right. So you could do the test today, I could make a little lab for you right over here and you couldn't exclude him?
>
> A. It takes two days.
>
> Q. I would speed it up for you, but you couldn't exclude him, right, because he has the exact same makeup as her?
>
> A. I could exclude him as far as being the individual that would have deposited the B antigen.
>
> Q. Right. But you could not exclude him as the perpetrator?
>
> A. No.
>
> Q. Okay.

Thus, we disagree that the results of serology tests exclude the petitioner as the rapist of T.R. The test results are made even cloudier by the fact that, although the record shows that T.R. had been to a movie prior to returning to her residence where she was raped, it does not reveal whether she attended the movie with a companion, or whether, if she had a companion, the B antigen later found

on the saliva swab could have been deposited if she had kissed her companion. T.R. was not called to testify at the post-conviction hearing.

As to the T.R. rape, the petitioner argues in his brief that "[h]ad [trial] counsel spoken to VanSant, however, counsel could have provided him necessary information to transform his conclusion that the tests were inconclusive to a conclusion [that] Petitioner was excluded as a suspect." In fact, VanSant's cross-examination was concluded by his admitting that even additional testing would not have excluded the petitioner as the rapist of T.R.

### b. Finding of the Two-by-Four

The petitioner claims that trial counsel were ineffective for not investigating the circumstances under which the two-by-four was found. Additionally, the petitioner claims that scientific proof shows that the two-by-four was not "linked" to the crimes.

Following his arrest, the petitioner had told Sergeant Heck how he had disposed of the two-by-four near the intersection of Old Ringgold Road and Chickalilly Road:

> Nichols: I noticed that there's like a big bluff there, you know, a slop, [sic]
>
> Heck: Goin' down towards the tunnels?
>
> Nichols: Yeah, it slopped [sic] there, there was a bunch of shrubbery and trees, and everything else in it, and, . . . uh, I went up the road and turned around and come back, and uh, my windows are electric, so I just rolled that side of the window down, and picked up [the] 2 by 4 outta the car and tossed it out the window, down that slop, [sic] and from there I went home.
>
> . . . .
>
> Heck: You threw it out the passenger window[?]
>
> Nichols: Yeah.
>
> . . . .
>
> Heck: Did you throw the 2 by 4 up hill or
>
> Nichols: No, I threw it down hill, cause I went down

Heck:    [It] could've been a ditch.

Nichols:  Uh, no it wadn't [sic] a ditch, it was, I know it was a slop, [sic] see, cause I'd went, when I turned left on Chickalilly, when I went down and turned around, and comin' back the opposite direction, and that way I threw it down hill.

Heck:    Can you take me to where you put this 2 by 4?

Nichols:  I can and I will.

His report described the petitioner's route following the attack on Karen Pulley:

He turned right on North Terrace and drove to Germantown Rd. where he turned left onto Germantown Rd. going into East Ridge. He drove to Ringgold Rd. where he turned right going toward the tunnels. Once he got to the tunnels he turned right and back to the left going up Old Ringgold Rd. Once at the [sic] of the tunnels at Eastview and Old Ringgold Rd. he made a U-turn and pulled to the side of the road. He used electric door windows and rolled down the front passenger side window and threw the 2X4 out of the window. He stated the board was by a big tree where he threw it.

. . . .

On 1-7-89 at approx. 1:20 AM, Harold Wayne Nichols took me to East Ridge to where he threw the 2X4 board out his car window. We located a 2X4 board lying at the base of a tree he indicated he threw the board. There were no other boards in the area and Mr. Nichols stated that it looks like the one he threw out of the window.

During the post-conviction hearing, Steve Miller, who was employed by the Chattanooga Police Department at the time of the murder of Karen Pulley, testified that an initial search of the area where the petitioner had said that he threw the two-by-four was unsuccessful. The petitioner criticizes trial counsel for not interviewing Miller or Sue Sanders Massey, Karen Pulley's roommate at the time of the killing, regarding the finding of the two-by-four. Massey testified that she went to the location where the two-by-four was found and that it was leaning against a tree when she arrived. There were already a number of people there. It appeared to her as if someone had leaned the board against the tree. She was not certain that the board had come from the house she shared with the victim. She said that the board was in a wooded area, down a drop-off or retaining wall, and not very far from the road. She had not been contacted by the petitioner's trial counsel prior to the Karen Pulley trial.

-37-

The initial report from Craig Lahren, who was then employed by the Hamilton County Medical Examiner's Office, regarding the two-by-four, stated that he found no hair or fibers on it. An affidavit from Mr. Lahren, filed as part of the petitioner's post-conviction proof, stated that in his initial examination he also looked for blood on the two-by-four and found none. Although junior trial counsel for the petitioner said that she was aware of Lahren's initial report and had interviewed him, Lahren stated in his affidavit that petitioner's trial counsel had not interviewed him. Dr. Neal Haskell, a forensic entomologist, testified at the post-conviction hearing that he found no blood, hair, or soft tissue on the board. He said that he did not believe that blood would have worked off of the board or that insects would have eaten any hair or blood present. Additionally, he testified that if the board had been exposed to the elements from September 30, 1988, until January 7, 1989, as it supposedly was, he would have anticipated finding plant material on it, which did not occur.

Senior trial counsel testified that although neither blood nor hair from Karen Pulley was found on the two-by-four, it was located where the petitioner said that he had thrown it, after driving "up old Ringgold Road off the Bachman tubes."

### c. Hair Evidence

The petitioner states that post-conviction counsel obtained a large number of hair evidence samples gathered at the Pulley crime scene from the Hamilton County Medical Examiner's Office and sent them to a private lab for testing. Two slides from pubic hair combings of the victim were obtained which contained hairs inconsistent with both the victim and the petitioner. The petitioner submits that, in light of evidence that Pulley was a virgin prior to her rape and murder, trial counsel should have discovered this "extremely exculpatory evidence" and used it to establish reasonable doubt as to his guilt in the Pulley case. The State responds that the forensic report upon which the petitioner relies notes that hair evidence is easily transferred. Considering that Pulley lived in a house with two roommates whose hair was not submitted for sampling, the State submits this evidence is not dispositive of the petitioner's innocence of the Pulley rape.

The report of Forensic Science Associates, upon which the petitioner relies, was dated January 20, 1998, the month following the conclusion of the post-conviction hearings in this matter. Thus, no witness testified as to the contents of the report. According to the report, of five hairs on two of the microscope slides with pubic combings of Karen Pulley, one hair on each slide could not be "associated with any of the individuals for whom reference samples were submitted." These individuals included both Karen Pulley and the petitioner. In the "Discussion" portion of this report are a number of qualifiers and caveats. First, we note that the report does not define its usage of the word "associate." It does state, however, that:

> In order to be relevant to an investigation, an evidence hair (that is, one recovered from a crime scene, from the clothing of victims or suspects, etc.) must be shown to be related to the incident under investigation. Since hairs are ubiquitous in the environment, degrade very slowly, and are easily inadvertently picked up, transferred, or

shed, a loose hair is of relatively little significance without some independent knowledge that it is related to the incident being investigated. If it is possible to infer from the location of the hair, the circumstances of its recovery, and the nature of the hair itself that the hair is related to the incident being investigated, then the hair may be relevant to the investigation.

When asked about the hair samples during the post-conviction hearing, senior trial counsel pointed out that there were a total of three young women living in the house. In fact, the evidence showed that Karen Pulley lived with two other young women whose hair was not compared with the two unknown hairs. The record does not reflect what the laundry arrangements were for the three women or explore the other ways in which a hair could have been transferred to Karen Pulley. Accordingly, we consider the findings of this report as not to "exclude [the petitioner] as the person who raped and murdered Ms. Pulley."

### d. Alibi in Case Not Included in Post-Conviction Petition

The petitioner was also charged with the rape of T.M. in Tiftonia, Tennessee. Although that case is not among those on appeal in this proceeding, post-conviction counsel submitted evidence at the post-conviction hearing that the petitioner was physically present at work at the Godfather's Pizza store in Red Bank, Tennessee, at the time of the T.M. rape. The petitioner argues that trial counsel, who represented him in connection with all of the various offenses for which he was charged, thus missed solid alibi evidence with respect to the T.M. case which, if discovered, should have led them to question the reliability of his other statements, including, in particular, his confession to the Pulley rape and murder. However, we note that T.M. identified the petitioner as the man who raped her, and the proof of alibi claimed by the petitioner must be measured against that identification as well as the fact that he confessed to raping T.M.

The petitioner gave a statement to Detective Sivley of the Chattanooga Police Department regarding the attempted rape of T.M.:

> SIVLEY: Okay, tell me about that.
>
> NICHOLS: That's where I entered the back door, broke the window.
>
> SIVLEY: You had to force your way in?
>
> NICHOLS: Um huh.
>
> SIVLEY: Okay, so you broke a window? Was there a screen there on the window?
>
> NICHOLS: There was, yeah.

SIVLEY: Did you tear it off?

NICHOLS: Yeah. Pulled the screen off, broke the window, went into that door. She was in the shower.

SIVLEY: Did you know she was in the shower before you went in[?] Were you watching her?

NICHOLS: Yeah. Yeah.

SIVLEY: Okay, you saw her go into the shower?

NICHOLS: No, no, I just seen her in, in the shower.

SIVLEY: Looked inside and saw her in the shower?

NICHOLS: Yeah.

SIVLEY: Okay.

NICHOLS: And uh I got a knife out of the kitchen and then

SIVLEY: What kind of knife was it? Butcher knife, steak knife?

NICHOLS: Big knife.

SIVLEY: Big knife. Where was it at in the kitchen?

NICHOLS: Uh, kitchen drawer, I think . . . and when she come out of the shower, well . . . I surprised her and she scuffled with me and I hit myself with the knife and that's what all happened.

SIVLEY: Did you notice if she was cut also?

NICHOLS: No, I didn't.

SIVLEY: Where were you cut at?

NICHOLS: Just below the eye.

SIVLEY: Is that, uh . . . looks like there is a mark right below your right eye. Is that what happened there?

NICHOLS: Yes.

SIVLEY: Okay, did you notice that you bled as you went out? Were you bleeding, did you

NICHOLS: I

SIVLEY: feel yourself bleeding?

NICHOLS: was bleeding. I knew I was bleeding.

Junior trial counsel testified as to their investigation of the offenses and possible alibis. When asked about a possible alibi for the T.M. rape, she said:

> [Senior trial counsel] and I spent a lot of time on these times of the offenses for a couple of reasons. One was, with no meant disrespect to the police officers, but so many of these crimes happened in the early hours of the morning after midnight that what we found is that the officers would get sort of mucked up when they were doing their timing, you know, they would sometimes put – like say if it was on the 20th but it was at one a.m., they would put one a.m. on the 20th or one a.m. on the 21st, you'd have two different dates on different things.

> In fact, one of the cases that we tried, the rape cases that we tried, and I don't remember which of the two victims it was, but on one of those cases we spent about three hours of the court's time at the initial – when we got ready to begin the trial, arguing, complaining because the state had made one of those mistakes, the officers had made one of those early in the morning date transpositions and then on the morning of trial [the prosecutor] tried to correct it, but they made another clerical error in that correction, so we jumped on that and, you know, gave them a very hard time about that as we were supposed to and as we wanted to, although we were fairly confident that the actual time of the offense, we knew when it was and, of course, we lost that motion, but we were well aware of those time discrepancies in some cases.

> Now, again, I can't tell you exactly what happened in [T.M.]. Another thing that we were aware of is that Wayne was clocked in some of the times that some of the rapes were supposed to have occurred, but I talked to Wayne about those things and all of those – and I can't tell you what the answer was on [T.M.] because I just

don't recall that particular one, but Wayne and I talked about a lot of time things.

There was one, and it may have been [T.M.], where he supposedly could not have done it according to his wife. Well, I spent many, many hours talking to Joann and to Wayne about this time thing and was this really a defense we had and it turned out it wasn't, and again I don't remember why. It was either he was clocked in but he had gone to deliver a pizza.

Another one of them Joann said he was in bed with her but when we questioned her carefully and talked about it she remembered she woke up that night and Wayne was gone, she figured he was in watching TV and woke up a couple hours later and went back and he was not in the living room watching TV, so she said, "Oh, yeah, that's right, he wasn't there that night."

So there were things like that that we looked at and tried to ascertain if they would be helpful and they weren't, none of them turned out other than this one we were able to argue the morning of trial which ultimately we lost, turned out to be helpful.

This testimony demonstrates that trial counsel did consider and investigate whether the petitioner had alibis for the offenses and was aware that at least one had occurred when the petitioner was "clocked" in at work, but had left to deliver a pizza. Based upon conversations with the petitioner and his wife, counsel determined that alibi defenses could not be supported.

### e. Pistol Found in Petitioner's Vehicle

The petitioner has also alleged that counsel were ineffective for failing to investigate the "discrepancy" in the description of a pistol found in the trunk of his automobile. According to the petitioner's brief, the only pistol "associated with any of the rapes was a blue steel revolver." According to the property sheet prepared by Officer Bryson, the pistol was an "Auto SST."

As set out in the offense report, S.T. told officers that she had been raped by a man who entered her apartment and, apparently, stole from her a "38 revolver." The petitioner pled guilty to the rape of S.T. During the trial court's questioning of the petitioner, prior to the acceptance of his guilty pleas, the court asked if the petitioner was satisfied with the representation which he had received from his attorneys. He responded that he was, that they had not left undone in the case anything that he wanted them to do, and that he believed there was a basis upon which a jury could find him guilty in the matter. The prosecutor then outlined the State's proof. He said that officers had received information that the petitioner was a "possible suspect" in the case and had S.T. come and view photographs, from which she identified that of the petitioner as being her assailant. The

-42-

prosecutor further stated that the petitioner subsequently gave a tape-recorded statement of admission as to the rape of S.T. and that he signed a consent to search. Upon searching his vehicle, officers found S.T.'s .38 caliber revolver and a knife used by the petitioner in the attack. According to the prosecutor, S.T. identified both the pistol and the knife. Subsequently, officers took the petitioner to the apartment complex, and he pointed out the apartment of S.T.

The petitioner points to an apparent discrepancy in the records as to whether the pistol recovered from his automobile was, in fact, a .38 revolver. He argued in his brief that, "objectively reviewing" his attorneys' advice that he plead guilty in the S.T. case, they should not have done so because the pistol seized from his automobile did not match the one taken from S.T.

In support of this allegation, the petitioner relies upon testimony from the post-conviction hearing. Dwight Short, an employee of Inter Arms, which imports, manufactures, and sells firearms, testified at the post-conviction hearing that, in his experience, "auto" would refer to a semi-automatic weapon and "SS" would mean that the weapon was made of stainless steel. He was unsure of what a "T" would designate. He said that he would not expect to find the designations "auto" and "SS" on a blue steel revolver, which was supposedly imprinted upon a pistol recovered from the petitioner's vehicle. However, upon cross-examination, Mr. Short, who had not been shown the actual pistol in question, testified that he had traced the serial number which had been supplied to him, presumably for the weapon recovered from the petitioner's vehicle, and found it was for a "three-inch .38 Rossi revolver with a blue finish." Thus, the upshot of this testimony appears to be that the property receipt for the recovered pistol referred to it as being an "Auto SST," while, according to the serial number recorded for it, the pistol was a "three inch .38 Rossi revolver with a blue finish." S.T. had told officers that the rapist had taken a .38 revolver from her residence.

Regarding the pistol, senior trial counsel testified that he remembered "something contradictory" about a weapon in one of the cases, and "[t]hat was an issue that we worked on." Although the testimony of junior trial counsel was not entirely clear on this point, she testified that the "gun that [post-conviction] counsel talked about was found." She also testified that the prosecution had tried to use the alleged value of the pistol "to try to make it a higher offense for the theft," but the trial judge had given her "permission to get the gun and take it out and have it appraised, which [she] did at Clark's Guns." Thus, the record shows that trial counsel had been aware of the issue as to the pistol recovered from the petitioner's vehicle and had investigated it. We note that the pistol, apparently, would have been evidence only as to the rape of S.T., to which the petitioner pled guilty. In that case, the petitioner had confessed.

### f. Other Suspects

As part of his claim that trial counsel were deficient for not investigating "critical evidence," the petitioner argues that they could have established reasonable doubt through some of the other persons investigated for the rapes. However, the record shows that trial counsel dealt with this issue in their representation of the petitioner.

During a hearing on January 4, 1990, apparently to determine whether the petitioner's trial counsel had received all of the exculpatory evidence, his senior trial counsel questioned Sergeant Buck Turner regarding identifications, apparently by two or more of the victims, of a "Mr. Coats." Additionally, during the trial involving the rape of P.R., she was questioned during direct examination by the prosecutor regarding whether she had identified "Coats" as the rapist. She said that she had looked at his photograph, and there were a "lot of his features" which were like those of the man who had raped her. However, when she saw him several days later in a lineup, she told police officers that he was not the one. Later, at the East Ridge Police Department, she viewed a series of photographs, one of which was that of the petitioner, and identified him as the rapist. Additionally, she made an in-court identification during the trial of the petitioner as the man who had raped her. Although the petitioner criticizes his trial counsel for not questioning P.R. about her identification of Coats, the fact is that the "misidentification" had already been brought out on direct examination by the prosecutor. P.R. also testified that, before she was raped, the petitioner had threatened to kill the three young children who were sleeping in the apartment if she did not submit to him. Thus, under the circumstances, it is debatable whether it would have been in the petitioner's best interest to cross-examine P.R. about a misidentification which she had already explained during direct examination.

During the post-conviction hearing, senior trial counsel testified that he was fully aware of the "Coats' [sic] matter." Junior trial counsel testified that she checked the records of some of the persons who had been investigated regarding the rapes, but she "never thought or had any reason to believe" that Redwine, one of the suspects named by the petitioner, had raped and murdered Karen Pulley. She said that she had discussed the other suspects with Sergeant Heck and corroborated the information from him when necessary.

The post-conviction court, with respect to this portion of petitioner's claim that trial counsel were ineffective for not investigating whether his confessions were false, made the following findings as to the noncapital cases:

> [B]oth trial counsel and investigator Cohan stated that any issue related to actual innocence was not plausible. The petitioner gave them all detailed statements concerning his involvement in the cases. Trial counsel stated that on the one case where the petitioner claimed he did not commit the offense charged, he was telling the truth and they were able to get the charges dismissed. Trial counsel further stated that there was not any evidence which would have established

-44-

any "reasonable doubt" and that if there had been they would have pursued it. After thoroughly reviewing the records, this court finds that petitioner has not carried his burden of proof on this issue by establishing that there was sufficient evidence of actual innocence that counsel's actions were deficient or otherwise sufficiently prejudiced the defense.

As to the capital case, the post-conviction court made a similar finding:

Trial counsel and investigator Cohan testified that any allegation that counsel should have more fully researched the possibility of a false confession was "ludicrous." The petitioner gave very detailed statements to trial counsel separate from his statements given to the police. Trial counsel testified that they thoroughly discussed the options available with the petitioner and that the petitioner understood that his confessions would be very damaging evidence at the guilt phase. They advised him that if he entered a guilty plea and took responsibility for his actions that the jury might take this into consideration in the penalty phase and not impose the death penalty despite the obviously weighty aggravating factors. Under all the circumstances, the decision to plea [sic] was a strategic decision which will not now be questioned using 20-20 hindsight. It is also noted that counsel's time records "speak for themselves" as to the substantial amount of time expended by counsel on this case. These issues have no merit.

In support of his claims regarding ineffective assistance of counsel, the petitioner relies on several cases. First, in Baylor v. Estelle, 94 F.3d 1321 (9th Cir. 1996), cert. denied, Duncan v. Baylor, 520 U.S. 1151, 117 S. Ct. 1329, 137 L. Ed. 2d 489 (1997), the defendant, Baylor, had been charged with sexual and related offenses as to two victims. Neither of the victims had identified him, and no physical evidence tied him to the crimes. He had given a detailed confession on tape to a police officer who testified at the trial. However, at the trial, the defendant testified, recanting his confession, and offering an alibi, which was corroborated by his wife as to the first victim.

Several months prior to the trial, a sheriff's department criminologist had issued a report which concluded that the results of tests comparing blood and saliva samples from the defendant with seminal fluid from the first victim and semen stains from the clothing of the second victim "would tend to eliminate" the defendant as the semen donor because he was a secretor and the semen obtained in each case was from a nonsecretor. Id. at 1323. The report also said that there was a "possibility that [the defendant] mimic[ked] a nonsecretor and that this theory could not be tested without a liquid semen sample from [the defendant]." Id. Defense counsel knew of the report before the trial but neither followed up on it with the serologist nor had the defendant tested by another

expert. Counsel did not try to subpoena the criminologist until the trial was underway, and found that the witness was on vacation and unavailable.

Following his convictions on all counts, the defendant filed a petition for writ of habeas corpus, first in the state court and then in the federal court. A federal magistrate ordered serological testing of the defendant's seminal fluid. The result of that test, interpreted by both a defense and an independent expert, was that the semen on the vaginal swabs from the first victim was genetically incompatible with that of the defendant. The author of the original report testified at the evidentiary hearing as to the caveat in his report that had been available at the time of trial that "there was only a 5% likelihood that a secretor would mimic a nonsecretor." Id. at 1324. From all of this, the court concluded that the defendant had not received effective assistance of counsel at trial.

As for the prejudice prong, the court noted the State's argument that the defendant related facts in his confession which were previously unknown to the victims or the investigators, namely that he had removed five bullets from a pistol at the first victim's house and had hidden them under the cushion of a large chair in the living room. These bullets were not discovered until after the defendant told of their location. However, the court stated that its confidence in the trial's outcome was shaken by the laboratory reports that eliminated the defendant as the donor of semen found on the first victim. Further, the court agreed with the district court's findings that since all convictions were based upon the same confession, reasonable doubt as to the defendant's guilt of the first offense would have created doubt as to his guilt of the second. Accordingly, the court concluded that the defendant had established that he had been prejudiced by the ineffective assistance of counsel.

The Baylor holding is readily distinguishable from the matter that we have under consideration. First, unlike Baylor, who recanted his confession and presented an alibi defense, which was corroborated by his wife as to one victim, the petitioner, even post-trial, continued to affirm that his confessions were true. Also, unlike Baylor, who was not identified by either victim, the petitioner was identified as the rapist in both of the noncapital cases that were tried, by the victims P.G. and P.R. Unlike the additional serology evidence presented in Baylor, the only such proof shown on behalf of the petitioner was the testimony of Mr. VanSant, who testified as to work of other serologists and only as to two of the victims. As we have previously discussed, his testimony did not exclude the petitioner as the rapist of Karen Pulley or T.R. The opinions offered by Mr. VanSant are simply not exculpatory, as was that of the serologist in Baylor. Further, we note that there were no claims as to exculpatory scientific evidence made as to the rapes of P.G., P.R., or S.T.

There are other important distinctions between these cases. In Baylor, subsequent testing of the defendant by two experts had "excluded [him] as the donor of the semen found on the first victim." Id. at 1324. The results of these subsequent tests caused the court's "confidence in the outcome of the trial [to be] shaken." Id. Although the petitioner has argued that the serology test results from the time of his trials eliminate him as the rapist of Karen Pulley and T.R., we do not agree, as we have previously explained. While it can be claimed, as the petitioner has done, that the serology test in the Pulley matter, on its face, would appear to exclude him, we note that even though

serology experts were available at the time of the post-conviction hearing, including the author of the report upon which the petitioner relies, no expert testified that, in fact, the results of that test excluded the petitioner. In light of this, taken with the fact that the petitioner continued to admit his guilt of the crimes, our confidence in the outcome of the proceedings is not "shaken."

In Charles Dwayne Prince v. State, No. 01C01-9102-CC-00058, 1992 WL 127439 (Tenn. Crim. App. June 12, 1992), the next case cited by the petitioner, Prince had been charged with aggravated rape. However, unlike the petitioner, he had not confessed to the crime. The victim had picked Prince from a photo lineup. She admitted that she was "somewhat acquainted" with the defendant, but had denied he was the rapist when confronted with him at the police station. Id. at *1. Additionally, she had described the rapist as having blonde hair, and the proof showed that Prince had brown hair.

At the trial, a serologist had testified that results of the test comparing a semen sample from the victim with the defendant's secretions were inconclusive. However, at the hearing on the petition for post-conviction relief, another serologist testified that, in her opinion, trial counsel for the defendant had not sufficiently questioned the trial expert witness regarding the testing of the samples. She opined that the semen sample from the victim could not have come from the defendant. Thus, there was the unequivocal statement of an expert witness that the results of a scientific test eliminated Prince as the rapist. There is no such report here. Additionally, unlike the petitioner, Prince had not confessed to the crime.

Also cited by the petitioner is Sims v. Livesay, 970 F.2d 1575 (6th Cir. 1992). In Sims, the defendant's wife died from a single gunshot wound to the chest, which occurred in the bedroom of her home. The defendant told police officers that he had been in another room, heard his wife fire a pistol twice, went into the bedroom, and, as he grabbed the gun and tried to hold it away, it discharged, killing his wife. On the bed where his wife was shot was a quilt which had three bullet holes in it.

The State's theory was that the defendant shot his wife as she sat naked on the bed, and that he was at a distance from her, not struggling with her as he claimed. The State pathologist testified that the victim's wound was "clean" and that if she had been holding the pistol as it was fired, there would have been tattooing around the wound. According to the State's theory, the gunshot residue on the victim's hands came from her holding up her hands in self-defense as her husband fired the shot at her. The quilt with the three bullet holes was not offered into evidence or even examined by the State pathologist.

At trial, the defendant again said that the shooting was accidental and occurred as the parties struggled for the pistol. The defense presented as a witness a TBI agent who said that the victim could have fired the fatal shot, but did so with her left hand although she was right-handed. The victim's right hand had a relatively low concentration of gunshot residue. Defense counsel did not have this expert examine the quilt, and there was no testimony regarding it.

Following his conviction and subsequent unsuccessful appeals, Sims filed a petition for post-conviction relief, claiming that defense counsel should have retained an expert to examine the evidence and determine if the quilt was between the victim and the pistol when the shot was fired, which would have explained why the victim's wound was clean and undermined the State's claim that the wound was clean because the victim was shot from a distance.

At the post-conviction hearing, two experts testified. The first, a forensic firearms examiner, said that the slug that killed the victim probably passed through the quilt, which would have prevented powder residue from being deposited around the area of the wound. He also noted that there were "butterfly patterns" around the holes in the quilt, indicating that the quilt was around the pistol when one shot was fired, was almost around the pistol during the second shot, and in less contact for the third shot. Id. at 1578. The upshot of his testimony was that the presence of the quilt had to be considered in ascertaining the distance between Mrs. Sims and the pistol as it was fired. The second expert witness, who was the chief medical examiner for Atlanta, confirmed the testimony of the first. Additionally, he said that the gunshot residue test done on the victim's hand indicated that she could have fired the fatal shot herself and that the other two shots, which were not fired into her body, could have been "hesitation or test shots," which were not atypical in cases of suicide. The second expert concluded his testimony by saying that the evidence suggested "strongly the possibility that it was either an accident or she intentionally tried to take her life and did so." Id.

The court noted that, prior to the trial, defense counsel had an FBI report which stated there was gunshot residue on the quilt. From all of this, the court concluded that defense counsel's failure to have a defense expert examine the quilt prior to the trial, or even argue to the jury that the quilt was between the pistol and victim, was not reasonable, and was, in fact, negligence. Accordingly, the court ordered a retrial of the matter.

Both factually and proof-wise, Sims is substantially different from the matters which we have under consideration. Here, the duty of petitioner's trial counsel to utilize scientific tests was shaped by his numerous and continuing confessions to the offenses charged.

Thus, these cases are not supportive of the petitioner's claims of ineffective assistance of counsel.

We will now examine cases which have considered post-conviction claims similar to those of the petitioner. The court, in Mueller v. Angelone, 181 F.3d 557 (4th Cir. 1999), cert. denied, 527 U.S. 1065, 120 S. Ct. 37, 144 L. Ed. 2d 839 (1999), considered the habeas corpus petition of Mueller, who had confessed on videotape to the rape and murder of a ten-year-old girl, for which he was convicted and sentenced to death. Mueller had claimed that his trial attorneys had not satisfied Strickland's performance prong because they had failed "to investigate and present evidence of his susceptibility to giving a false confession[.]" Id. at 579.

Noting that Mueller "until shortly before trial, consistently admitted his guilt to his attorneys and maintained to them that his confession was truthful," id., the court, applying the objective reasonableness standard of Strickland, concluded:

> We cannot say, then, that it was objectively unreasonable for counsel to opt not to expend investigative energies and resources on their client's susceptibility to false confession where the client had assured them that his confession was true. See Strickland, 466 U.S. at 691, 104 S. Ct. [at] 2052.

Id. Citing Barnes v. Thompson, 58 F.3d 971, 979-80 (4th Cir. 1995), the Mueller court noted the difficulty that counsel would have had in pursuing a "trial strategy on evidence of defendant's susceptibility to false confessions when the defendant himself had admitted the truthfulness of his confession and his sole responsibility for the crime." Id.

The Mueller court concluded that the petitioner failed to demonstrate that his trial counsel had a constitutional obligation to attack his confession as being false:

> Even if we were persuaded that Mueller's trial counsel might have profitably pursued such "leads," petitioner has not satisfied his burden of demonstrating that their failure to do so fell outside the wide range of reasonable professional assistance. In fact, petitioner has not cited a single case in which trial counsel, charged with representing a defendant who had confessed to the crime not only on videotape but to counsel themselves, nonetheless pursued a "false confession" line of defense. Trial counsel in this case did what reasonable attorneys are wont to do when their client has confessed on videotape to the grisly details of a heinous crime – they moved to suppress. We decline to hold that trial counsel were under any constitutional obligation, when that motion was unsuccessful, to attack as false a confession their own client had acknowledged was true.

Id. at 579-80.

Finally, the court concluded that Mueller did not establish prejudice allegedly resulting from trial counsel's inactions:

> In any event, even were we to find that counsel's performance fell below an objective standard of reasonableness, we can identify no prejudice under Strickland from their failure to investigate and pursue this "lead." In our view, evidence of Mueller's alleged susceptibility to false confession would have been very unlikely to lessen the

-49-

impact of the defendant's own confession and his ability, after thus unburdening himself, to lead the police to the very area where Charity's body was found.

Id.

Likewise, in Thomas v. Taylor, 170 F.3d 466 (4th Cir.), cert. denied, 527 U.S. 1016, 119 S. Ct. 2361, 144 L. Ed. 2d 254 (1999), the Fourth Circuit Court of Appeals held that trial counsel had not been ineffective for failing to pursue whether the defendant's confession was false, when he had consistently told counsel that it was true. The defendant, who was then seventeen years old, had plotted with his girlfriend, age fourteen, to kill her parents because they had been threatening to end the relationship. He took a shotgun loaded with buckshot, entered the victims' house through their daughter's bedroom window, and spoke with her, pausing briefly to smoke marijuana. He then went to her parents' bedroom and shot her father in the head at close range, killing him instantly. Next, he shot her mother "in the head, essentially destroying the left side of her face." Id. at 469. He then returned to his girlfriend's bedroom. Her mother, even with the gruesome injury, walked to her daughter's bedroom to ascertain her child's condition. Upon seeing her mother in the doorway, the daughter said to the defendant, "Oh, God, Chris, please shoot her again." Id. The defendant obliged, killing the mother instantly as he shot her again in the head with the shotgun. Subsequently, the defendant confessed to both murders and repeatedly told his trial counsel that he had fired the second shot which killed the mother of his girlfriend. He pled guilty to the murder of the father, for which he received a sentence of sixty-seven years. He pled not guilty to the murder of the mother, but was convicted of this offense and sentenced to death.

Subsequently, he filed a petition for writ of habeas corpus, alleging, *inter alia*, that trial counsel was ineffective for not investigating and presenting evidence that his girlfriend had fired the fatal shot that killed her mother. In his petition, he claimed that, although he had told his court-appointed psychological expert that he did not fire the second shot, his attorney did not adequately pursue this lead.

The court noted that he had repeatedly told trial counsel that he had fired both of the shots that killed the mother. When they confronted him with his statement to the psychological expert that he had fired only the first shot, and "begged [him] to come clean," he again told them that he had fired both of the shots. Id. at 471. Citing the language in Strickland that the "reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions," 466 U.S. 668, 691, 104 S. Ct. 2052, 2066, 80 L. Ed. 2d 674 (1984), the court concluded that counsel was not obligated to investigate further whether the defendant had fired the second shot.

The claims of the petitioner appear to be unusual among those cases asserting ineffective assistance of counsel resulting from failure to investigate whether confessions are "false," for, unlike other such claimants, he did not, at the time of trial or subsequently, assert that any of his confessions were false. Rather, even post-trial, he confessed to both Karen Pulley's mother and to his uncle, and reiterated to Dr. Solovay, who interviewed him to prepare for the post-conviction hearing, that he

-50-

was guilty of the offenses and willing to plead guilty. Thus, it is difficult to envision, and requires some imagination upon our part, exactly what could have been achieved had trial counsel "investigated" his confessions, as he claims should have been done.

It is argued in the petitioner's brief, as a conclusion to a discussion of the various reasons why a "false confession" defense should have been presented, that "[h]andled properly, a 'false confession' defense would be a no downside defense, especially in light of other exculpatory evidence." We disagree with this conclusion. Even assuming that there could have been a "proper" way to present a "false confession" defense, it is arguable that the presentation of the defense could have opened the door to the State's presenting proof of charges against the petitioner which had not been resolved at the time of the Pulley trial. A substantial part of the post-conviction claim is to stress the importance of the "time line" of the petitioner's being arrested and subsequently confessing to law enforcement officers. Given the claims regarding coercion, "cueing" as to the facts, and holding the petitioner in custody for a lengthy period, the State could argue, in response to a "false confession" defense, that the claim had made relevant a complete time line of the period of his arrest, which included multiple confessions to attacks upon ten women, directing officers to the place where a two-by-four was found and pointing out the apartment of one of the rape victims.

In Campbell v. Vaughn, 209 F.3d 280, 282 (3rd Cir. 2000), cert. denied, Campbell v. Johnson, ____ U.S. ____, ____ S. Ct. ____, ____ L. Ed. 2d ____, 2001 WL 12752 (2001), also a post-conviction proceeding, the defendant had confessed to shooting and killing a motorist who was stopped at a traffic light. The defendant and his brother waited at a freeway off-ramp for the victim to drive up, pulled him from his car when he stopped for the light, and then shot and killed him. The defendant's brother jumped into the victim's car and drove off with the victim's four-year-old daughter still in the passenger seat. When the victim's wife, who had been following in another car, drove up, the defendant grabbed her purse, struggled with her, and then fled. She ran to her husband's car, which had been immobilized by ice, and convinced the defendant's brother to release her child. The defendant was later tried, convicted of second degree murder and other charges, and sentenced to life imprisonment plus consecutive terms for the other offenses. He filed a petition for writ of habeas corpus, claiming, *inter alia*, that his trial counsel had incorrectly advised him as to testifying at the trial. Denying the claim, the federal court concluded as to the finding of the state court that counsel had not been ineffective in this regard: "[t]he Court reasoned, appropriately, that Campbell's trial counsel did not render ineffective assistance by warning him that if he were to take the witness stand and recant his remorse-filled confession, he would likely alienate the jury. If anything, this was sound advice." Id. at 291. Although the opinion in Campbell does not explain what additional defense proof might have been shown if the defendant had recanted his confession, it illustrates that to do so may have a deleterious effect.

In determining whether the petitioner has satisfied either of the two prongs required by Strickland, we will first consider the situation in which trial counsel found themselves at the time of the petitioner's trials. The petitioner had given multiple confessions to the offenses with which he was charged. Regarding the most serious of the charges, the rape and murder of Karen Pulley, his confession was over an hour in length and was videotaped. As previously set out, we have

viewed the videotape of this confession and conclude that it would have been very dramatic and powerful evidence of the petitioner's guilt as to that crime. He appeared to be genuinely moved as he told of attacking Karen Pulley. The petitioner's statements to both trial counsel, as well as their investigator, were consistent with his confessions to law enforcement officers. Trial counsel's motion to suppress the confessions was unsuccessful. The petitioner has not attempted to explain how, in view of his continuing to assert that the confessions were true, trial counsel could have effectively presented a "false confession" defense. There was not, and has never been, a showing that the petitioner was susceptible to suggestions and pressure and might have been led into giving false confessions. In fact, had trial counsel tried to present such a claim, they would have been confronted by proof showing that the petitioner was twenty-eight years old and married, with three previous felony convictions and time spent in the Tennessee prison system. Thus, he could not have claimed youth and inexperience as reasons for falsely confessing. The testimony of trial counsel at the post-conviction hearing showed that they had considered and weighed against the impact of the confessions, especially that on videotape, most of the various defenses which the petitioner now claims should have been raised. The proof shows that trial counsel and their investigator spent a substantial number of hours preparing for the charges brought against the petitioner and investigating possible defenses. Considering all of the facts and circumstances, we simply cannot conclude that no competent counsel would have elected to defend these matters as did petitioner's trial counsel.

Applying the Strickland holding that we must "evaluate counsel's challenged conduct at the time" the decisions had to be made, that we must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," 466 U.S. at 689, 104 S. Ct. at 2065, and that in challenging counsel's conduct a petitioner must show that "no competent counsel would have taken the action," Chandler v. United States, 218 F.3d 1305, 1315 (11th Cir. 2000), petition for cert. filed (U.S. Oct. 19, 2000), we conclude that the petitioner has failed to show that his trial counsel did not perform within the range required of attorneys in criminal cases.

Additionally, we conclude that the petitioner has failed to satisfy the second prong of the Strickland test by not showing a reasonable probability that, but for the alleged attorney shortcomings, the result would have been different. His initial confessions and the additional proof gave the prosecution substantial cases against him. Even assuming that trial counsel could have presented a false confessions/reasonable doubt defense, as he now claims should have been done, it is very uncertain that the outcome would have been different. However, he argues that, by presenting proof of innocence, he "demonstrated the requisite prejudice."

Specifically, in his reply brief, the petitioner claims that he has "stated unequivocally" that had he not received ineffective assistance of counsel, he would not have pled guilty to the rape and murder of Karen Pulley, by quoting language from his *pro se* petition: "Had counsel performed in accordance with their duties under the United States and Tennessee Constitutions, I would not have pleaded guilty to first degree murder, aggravated rape and first degree burglary. . . ." A petitioner cannot utilize a conclusory statement such as this in a post-conviction petition to satisfy the second prong of Strickland and, thus, shield himself from questioning by the State. Such a tactic is inimical

to achieving "[f]airness in the judicial process," as recognized in Bryan v. State, 848 S.W.2d 72, 81 (Tenn. Crim. App.), perm. app. denied (Tenn. 1992).

The petitioner has failed to show that the outcome would have been different in the Karen Pulley, P.G., or P.R. trials had trial counsel defended the cases by claiming that his confessions were false and by making the various other arguments which he feels would have established reasonable doubt. We cannot conclude that the juries in these cases would have agreed that there was reasonable doubt as to his guilt, in light of his detailed confessions, including the lengthy, detailed, emotional videotaped confession he provided in the Karen Pulley case.

The position in which petitioner's trial counsel found themselves at trial was similar to that of defense counsel in Ames v. Endell, 856 F.2d 1441 (9th Cir. 1988). Ames had been in a pickup truck which collided with a transport truck carrying a fifty-ton backhoe. All four of the persons in the pickup were thrown out, and one of them, James Boyle, the defendant's boss and owner of the truck, died as a result of the accident. At the hospital, the defendant smelled strongly of alcohol, and his blood alcohol level was found to be .17 percent. An emergency medical technician asked the defendant who had been driving, and the defendant replied that he had been the driver. However, a short time later, he told a state trooper that he had not been driving and was unable to remember the name of the driver. Following his indictment six weeks later, he told a state trooper that James Boyle, the deceased, had been driving at the time of the accident. This contrasted with statements of a witness who, prior to the accident, had seen the defendant entering the driver's side of the truck, with the three passengers entering on the passenger side, and with the testimony of the deceased's wife who said that she had been sitting in her husband's lap. She had also said that her husband did not allow strangers to drive the truck. The fourth person in the truck was a stranger, Rodney Hardy, who was being given a ride. There was also proof that, because of eye problems, James Boyle did not drive.

At his trial, Ames had agreed with his attorney that he would not testify and would not contest that he had been driving and was the driver at the time of the accident. However, the defense would contend that Ames had not been substantially impaired by the alcohol but had been blinded by the sun just before the accident and that there was failure of the truck's brakes. Defense witnesses testified as to the angle of the sun at the intersection, and others testified they had been blinded by the sun at the intersection minutes before the accident. Additionally, an expert in auto mechanics testified that the brakes on the pickup were in bad condition.

Following his conviction for manslaughter, Ames, with new counsel, sought a new trial, claiming, *inter alia*, that trial counsel had been ineffective for failing to adequately investigate the case and not presenting as a defense that he had not been driving the truck at the time of the accident. Following an evidentiary hearing and an adverse ruling, Ames, now represented by a third lawyer, appealed his conviction. Counsel then representing the defendant retained an accident reconstruction expert who provided a letter which "concluded from the position of the bodies after the accident that there was 'a very good chance that Rodney E. Hardy [the stranger being given a ride] was driving the vehicle.'" Id. at 1444. Following unsuccessful attempts to obtain relief from the Alaska Court

of Appeals and the Alaska Supreme Court, Ames filed a habeas corpus petition in federal court, which was unsuccessful at the district court level. Concluding that Ames had received effective assistance of counsel, the court on appeal explained trial counsel's duty to investigate the facts:

> Even if Gordon [trial counsel] assumed that Ames' admission to the emergency medical technician was the babble of a man in shock, Gordon still had no reason to believe that Ames could testify who was driving. He was under no constitutional obligation to put Ames on the stand to commit perjury. Nix v. Whiteside, 475 U.S. 157, 106 S. Ct. 988, 89 L. Ed. 2d 123 (1986). He was under a professional obligation not to do so. Alaska Code of Professional Responsibility DR 7-102(A)(4) (1982). At best, Ames as a truthful witness could have testified he did not know. The defense that he was not at the wheel would have had to rest on a hypothetical construction by a paid expert whom the jury would have had to believe rather than concrete convergent evidence pointing to Ames as the driver.

Id. at 1444-45.

Counsel in the case before us were in a similar situation in that, in view of the petitioner's confessions, they would have had to depend upon expert witnesses, assuming that such proof would have been available, to demonstrate the confessions were false and to contend with ethics rules as to how to deal with the petitioner's continuing position that the statements were true. Considering this, as well as the fact that the petitioner failed to present evidence at the post-conviction hearing as to what additional evidence would have been obtained by investigating whether his confessions were false, we conclude that he has failed to establish the prejudice prong of the Strickland test, that but for "counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694, 104 S. Ct. at 2068; see Hendricks v. Calderon, 70 F.3d 1032, 1042 (9th Cir. 1995), cert. denied, 517 U.S. 1111, 116 S. Ct. 1335, 134 L. Ed. 2d 485 (1996) ("Absent an account of what beneficial evidence investigation into any of these issues would have turned up, Hendricks cannot meet the prejudice prong of the Strickland test."); United States v. Ashimi, 932 F.2d 643, 649 (7th Cir. 1991) (stating that a petitioner cannot establish prejudice without showing "what the attorney would have discovered after 'adequate' investigation").

Additionally, in the cases involving the rapes of T.R. and S.T., both of which resulted in guilty pleas by the petitioner, there are additional required showings which he failed to make. "In cases involving a guilty plea or plea of *nolo contendere*, the petitioner must show 'prejudice' by demonstrating that, but for counsel's errors, he would not have pleaded guilty but would have insisted upon going to trial." Hicks v. State, 983 S.W.2d 240, 246 (Tenn. Crim. App.), perm. app. denied (Tenn. 1998) (citing Hill v. Lockhart, 474 U.S. 52, 59, 106 S. Ct. 366, 370, 88 L. Ed. 2d 203 (1985); and Bankston v. State, 815 S.W.2d 213, 215 (Tenn. Crim. App.), perm. app. denied (Tenn.1991)). Hill explains the showing of prejudice which must be made by a petitioner who entered a guilty plea:

In many guilty plea cases, the "prejudice" inquiry will closely resemble the inquiry engaged in by courts reviewing ineffective-assistance challenges to convictions obtained through a trial. For example, where the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error "prejudiced" the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea. This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial.

Hill, 474 U.S. at 59, 106 S. Ct. at 370.

Trial counsel testified that, after their investigations of the evidence and many conversations with the petitioner concerning the details he provided them in the Pulley and other cases, there was no reason whatsoever to believe that the petitioner did not commit the offenses. Therefore, junior trial counsel described any idea of presenting a defense based on the petitioner's actual innocence as "ludicrous."

In view of petitioner's confessions to police and his detailed statements to his trial counsel, there is no indication that an investigation as to the truth of the statements or of the evidence would have led counsel to any findings which, in turn, would have changed their recommendation that the petitioner plead guilty to the Pulley rape and murder. The petitioner maintains that advising him to plead guilty to the capital murder could only have made sense, and therefore been done on the reasonable advice of counsel, if such a plea were entered in order to avoid the possibility of a death sentence. Trial counsel testified, however, that after losing the battle to have the videotaped confession suppressed, their focus shifted to a strategy of trying to save the petitioner's life by presenting him in the best light possible, which included his taking responsibility for his crimes and offering mitigation evidence which might cause the jury to be sympathetic toward him despite his crimes. Applying the rationale of Hill v. Lockhart, we conclude that the petitioner has not shown that, but for the alleged errors of his trial counsel, he would not have pled guilty but would have insisted on trials in the cases in which he pled guilty.

As to our objective inquiry as to the reasonableness of trial counsel's defense of the petitioner, we conclude that he has failed to show that he did not receive effective assistance of counsel. Given all of the proof, we cannot say that no reasonable lawyer would have represented his or her client as petitioner's counsel did. Accordingly, this claim is without merit.

**C. Petitioner was Denied the Effective Assistance of Counsel by the Failure
of his Trial Counsel to File a Motion to Suppress his Statements on the
Theory that the Statements Were Made During a Period of Illegal Arrest**

The petitioner contends that he was arrested without a warrant and absent probable cause and submits that counsel should have used these facts to have his statements made to the police suppressed. The petitioner was taken into custody at his home at 11:06 p.m. on January 5, 1989, following an anonymous phone call to the East Ridge Police Department. The anonymous caller, later identified as the roommate of petitioner's employer, informed detectives investigating a series of rapes in the area that the petitioner matched the newspaper description of the suspect and that he was employed as a manager at Godfather's Pizza in Red Bank. The petitioner argues that there was no photographic identification of the petitioner by any of the victims prior to his arrest and that absent such identification, no other probable cause for his warrantless arrest existed.

As the basis for this claim, the petitioner relies on testimony that Polaroid pictures were taken of him on January 6, 1989, the day after his arrest, and that, according to police notes, at least three victims identified him from photographs between the hours of 12:15 a.m. and 5:20 p.m on January 6. The petitioner argues that there was no probable cause for his arrest other than the "unknown speculation" of the anonymous caller, and similarly argues that there was no cause for the search of his vehicle, which yielded a gun. The petitioner concludes that reasonably effective counsel would have challenged the validity of his warrantless arrest and would have moved to suppress all evidence obtained as a result. In particular, the petitioner asserts he was entitled to have statements made to police while under this "illegal detention" suppressed, including his videotaped confession to the Pulley rape and murder.

The State disagrees that no arrest warrant was issued prior to petitioner's arrest. The State cites Officer Daniel Dyer's police report, dated January 6, 1989, which refers to an anonymous caller who identified the petitioner as a suspect and also refers to a computer check which revealed that the petitioner had been arrested in the past for a "sex crime." According to Dyer's report, police conducted a photo line-up with several of the East Ridge rape victims upon receiving this information. One victim identified the petitioner as her assailant "in about five seconds," as did three other victims. The report concludes that a "warrant on one of the East Ridge cases was secured and detectives . . . took the suspect in . . . without incident." The State also contends that the record is incomplete on this issue due to the failure of post-conviction counsel to call the criminal court clerk of Red Bank to ascertain whether the arrest warrant was in her files, although counsel reserved the right to do so.

Finally, the State submits that the police clearly had probable cause to arrest the petitioner. Acting upon a tip from an anonymous caller, they conducted a computer search and discovered that the petitioner had previously been charged with attempted rape. They obtained a mug shot of the petitioner and conducted a photographic lineup in which he was positively identified by at least some of the rape victims. The State concludes that this issue, if not waived for failure to raise it on direct appeal, is without merit.

As to this issue, the trial court found as follows:

It appears that the petitioner was arrested without a warrant. After carefully reviewing the records and the arguments it appears that this issue focuses on whether any pre-arrest photo identifications of the petitioner were made by any of the victims.

There is ambiguous evidence on this issue and possibly trial counsel should have more fully pursued this issue at trial. Trial counsel stated that she was appointed after the petitioner had already waived his preliminary hearing but stated that she would have gathered the facts surrounding the arrest anyway. In considering this issue, it is noted that a thorough review of the exhibits and the records establish that counsel did in fact spend a great deal of time and effort on the petitioner's cases. Trial counsel filed numerous motions and constantly pushed for more discovery. The petitioner seems to believe that counsel was imprudent in relying on things said by Detective Heck but this court notes that Detective Heck seemed to be a very credible witness. Trial counsel stated that they spoke with the officers at length about the cases even if some of the officers did not remember it. Because counsel cannot recall the extent of what was developed concerning this issue, this court will assume for discussion that the ambiguities should have been more fully developed. The fact that this issue probably should have been more fully developed, however, does not establish the petitioner's claim.

Viewing the exhibits and records as a whole, it appears that some of the photo identifications occurred after the petitioner's arrest. This fact, however, does not establish that none of the identifications occurred before his arrest. Numerous documents and/or statements refer to some pre-arrest identifications. The trial court and the trial attorneys for both sides were aware of the problems created by the police departments' misleading use of times related to formal processes rather than to the actual times of events. One officer who had originally stated that there were pre-arrest identifications and had given a somewhat inconsistent statement at another time was deceased. Buck Turner, another officer who had given ambiguous statements, was called as a witness but this point was not cleared up with him on the stand. No victims were called to ask at what point they had made these identifications. Although petitioner has pointed out the ambiguities, it is this court's opinion that he has failed to establish the lack of any pre-arrest identifications and thus has failed to establish any prejudice on this issue. The mere fact that the

-57-

officers did not fill out their paperwork until after the petitioner had confessed and then noted his confession in their affidavits does not in and of itself establish that no pre-arrest identifications were made.

Testimony of trial counsel on this issue was that they aggressively pursued the suppression of the petitioner's statement from the outset because there was nothing else to tie the petitioner to the Pulley murder. Counsel argued at the suppression hearing that the information in the statement was not sufficiently corroborated, raised issues concerning the conditions surrounding the confessions, and argued that the petitioner requested but was never provided an attorney while being questioned. Senior trial counsel testified that he investigated the probable cause for arrest issue, although he could not recall the specifics of his investigation. He stated that he would have challenged the basis of the arrest at the suppression hearing had he not been satisfied that there was probable cause for the arrest. He did recall speaking with the police, specifically with Officer Buck Turner, and with the petitioner "a lot" concerning the arrest itself. Junior trial counsel also recalled investigating the arrest and its basis before arguing the motion to suppress the petitioner's statements. In sum, it appears that counsel investigated this issue, and the petitioner does not clearly state or describe any additional investigation that his attorneys should have undertaken although post-conviction counsel does attempt to make a showing that none of the rape victims identified the petitioner until after he had been arrested.

We agree with the post-conviction court that the record is ambiguous as to identification(s) of the petitioner and how they relate, in time, to his arrest. There is substantial evidence that the petitioner was identified by one or more of the rape victims prior to his being taken into custody. The records of the East Ridge Police Department contain an offense report dated January 1, 1989. That report, apparently prepared by Officer Dyer, states in pertinent part as follows:

> On January 5, 1989 at 20:10 hours Capt. L. Holland (ERPD) received an anonymous phone call from what is believed to be a white male stating that he knows the rapist because he works for him. He did not go into the facts as to how he knows this employee was the rapist, he just gave his name and advised to check him out. The caller called back a few minutes later and advised that he was the rapist manager and advised of his date of birth (DOB).
>
> A routine computor [sic] check was conducted on the information and it was discovered that this subject had been arrested on a sex crime in the past (CPD -1895). A copy of his mug shot was picked up by Chattanooga detectives and all investigators were advised to contact their victims and meet at the East Ridge station.
>
> I was able to contact the victim in this incident and she did respond as requested. Once at the ER station she was shown a photo line up of six subjects who favor in appearance. It took about 5 seconds

-58-

before she positively identified Harold W. Nichols as the man who had broken into her residence and attempted to rape her.

She was the fourth victim in a row to identify Nichols as their attacker.

A warrant on one of the East Ridge cases was secured and detectives from East Ridge, Chattanooga and this dept. responded to 918 Donelson # 15 in East Ridge and took the suspect in to [sic] custody without incident.

Thus, according to this report, it appears that prior to the arrest of the petitioner, at least one of the victims, after being shown a mug shot taken as the result of his previous arrest and conviction, had identified the petitioner as her attacker. The report states that she was the "fourth victim in a row to identify" the petitioner as the attacker, but does not name the other three victims. As to witnesses with information regarding this issue, Captain Holland was deceased at the time of the post-conviction hearing, and Officer Dyer was not called to testify.

Regarding the identification of the petitioner, Captain Holland of the East Ridge Police Department had testified during the trial of the petitioner for the rape of P.R. and the burglary of her residence concerning the circumstances of the petitioner's arrest:

> Q. All right. And how did it come about, sir, that Mr. Nichols was arrested on January the 5th?
>
> A. Sir, we received a call from an anonymous source that stated Mr. Nichols was a suspect in this crime. Acting upon that information we obtained a photograph. Had a photographic line-up. He was picked from that line-up. We went to his home at 918 Donaldson Road, Apt. 15. He was arrested there and transported to East Ridge Police Department.

Thus, assuming that police failed to obtain a warrant prior to the petitioner's arrest, there is substantial support for a finding that there were photographic identifications of the petitioner prior to his arrest. Captain Holland also testified at a hearing on January 4, 1990, that at least one victim identified the petitioner prior to his arrest. At that same hearing, East Ridge Detective Buck Turner testified that the police obtained a photographic identification of the petitioner prior to his arrest. None of the victims were called to testify at the post-conviction hearing. Detective Turner testified at the post-conviction hearing, but was not questioned regarding the arrest and identification of the petitioner. Thus, it appears that witnesses were available who could have shown whether there were identifications made of the petitioner prior to his arrest, but they either were not called or, in the case of Detective Turner, not questioned about it. Finally, the record also supports the trial court's conclusion that the occurrence of photographic line-ups and identifications following the petitioner's

-59-

arrest, which are clearly reflected by the record, does not preclude pre-arrest identifications also. Similarly, testimony that Detective Steve Miller took Polaroid photographs of the petitioner following his arrest does not preclude prior identifications of the petitioner on the basis of his mug shot. Accordingly, this assignment is without merit.

The petitioner has also argued that trial counsel were ineffective for not filing a motion to suppress his confessions, arguing that they were made following his being arrested without probable cause and, as an additional ground, that he was not taken before a "judicial officer" until "January 9, 1989, more than seventy-two hours after his arrest." As to the first part of this claim, we have already reviewed the evidence regarding the petitioner's arrest and agreed with the post-conviction court that the petitioner failed to show that certain of the identifications by the rape victims did not occur before the arrest.

We will next consider the petitioner's argument that he was not taken before a judicial officer until after the passage of more than seventy-two hours. This fact, according to the petitioner, mandates that his confessions, made during this period of illegal detention, should have been suppressed. As to this claim, the post-conviction court made the following finding:

> Petitioner has failed to establish this claim. Although no paperwork on the arraignment was introduced, there was evidence of an arraignment. In the transcript of the motion to suppress, the petitioner himself referred numerous times to the fact that he was arraigned the day after he was arrested. See Transcript of Motion to Suppress, p. 15-16. Petitioner did not testify to these facts at the post-conviction hearing. In addition, then ADA Bevil's notes refer to an arraignment before a special judge as well. Under these circumstances, petitioner has not established that he was not arraigned, that counsel was ineffective or that he was in any way prejudiced by counsel's failure to challenge the timing of the arraignment.

First, we note that during the hearing on the motion to suppress the confessions filed by trial counsel, the petitioner testified that he was taken to court for arraignment the next morning after his arrest. Thus, it appears that there was compliance with Tennessee Rule of Criminal Procedure 5(a), requiring that an arrested person be taken without unnecessary delay before the nearest appropriate magistrate. Therefore, the petitioner's argument is without merit that this confession should have been suppressed because a judicial determination of probable cause was not made within seventy-two hours of his arrest, as required by State v. Huddleston, 924 S.W.2d 666 (Tenn. 1996). However, even if we were to apply the considerations set out in Huddleston as to whether a confession should be suppressed: "(1) the presence or absence of *Miranda* warnings; (2) the temporal proximity of the arrest and the confession; (3) the presence of intervening circumstances; and finally, of particular significance, (4) the purpose and flagrancy of the official misconduct," Id. at 674-75, our conclusion would not be altered. First, we note that our supreme court has already determined in the direct

appeal of the petitioner's capital case that he was properly advised of his <u>Miranda</u> rights prior to giving his confession in that case. Also, we note that the confessions all appear to have been given within twenty-four hours of the petitioner's arrest and that, according to the testimony of Captain Holland, the petitioner had been identified by at least one of the rape victims prior to his being taken into custody. Thus, the claim is without merit that trial counsel were ineffective for not seeking to suppress the petitioner's confessions because a determination of probable cause was not made within seventy-two hours of his arrest.

### D. Trial Counsel Failed to Provide Effective Assistance of Counsel in the Penalty Phase

The petitioner submits that, although counsel presented mitigation evidence during the penalty phase, they "failed to do so in a manner that had any chance of swaying the jury." He further asserts that the extent of counsel's efforts during the penalty phase at trial involved identifying the general "theme" of mitigation and developing a list of witnesses. Thus, the petitioner concludes that he received ineffective assistance of counsel during the penalty phase. We will examine that claim.

At trial, counsel called seven witnesses: the petitioner, his wife, three ministers, a clinical psychologist, and a former co-worker and friend. The petitioner maintains that the additional evidence presented at the post-conviction hearing was not merely cumulative, but instead presented an in-depth picture of the abuse suffered by the petitioner in his father's home and in the orphanage. He asserts that persuasive testimony on this aspect of his life came from his sister; his cousins, Diana and Royce, who had lived with the petitioner and his family; five other cousins; a childhood neighbor; and a schoolmate.

The State responds that this issue is without merit because the defense team pursued the only option other than silence available to them in the penalty phase. As senior trial counsel testified, the defense strategy was "to make Wayne look as good as we possibly could and to present as much evidence as we could about his background that would make him sympathetic to the jury." The State concludes that counsel were successful in this regard, as characterized by the petitioner in his brief, in portraying the petitioner as a "good boy" and a "good Christian." With respect to witnesses the petitioner contends should have been called, such as the petitioner's sister, the State submits that the witnesses were either unwilling to cooperate with the defense team or had no information which would have significantly assisted counsel's efforts to avoid the death sentence.

The following testified as mitigation witnesses during the penalty phase of the trial:

Reverend L. E. Butler, a minister, had known the petitioner since childhood through church activities and was a friend of the family. Butler testified that the petitioner was raised in the church and was well-liked by those who knew him. He had a character of the "best quality" as a child. In meetings at the jail since the petitioner's arrest, Butler found that same character was still there. Butler was aware of the petitioner's guilty pleas and stated he had shown remorse for the Pulley rape and murder. On cross-examination, Butler recalled telling Dr. Engum that he saw nothing to indicate

the petitioner had any mental, emotional, or psychological problems that would have caused him to commit these crimes.

Joanne Nichols testified that she married the petitioner in a church wedding in 1986 after dating him for four months. She described him as a "complete gentleman" on the night they met when he stayed overnight at her apartment and "nothing happened." Mrs. Nichols testified it was the "perfect marriage," that the petitioner helped around the house and was never mean to her. The petitioner was always caring and nice and would become upset if he felt he had upset her. Mrs. Nichols described her younger sister as worshiping the ground the petitioner walked on and stated her brother also enjoyed the petitioner's company. The petitioner and Mrs. Nichols initially lived with the petitioner's father for four to five months. The relationship between the petitioner and his father was not good, and the father was described as "very cold and very harsh and very unloving." In the time prior to his arrest, the petitioner was a manager at Godfather's Pizza, a job which required him to work late hours, but the petitioner sometimes did not come home at all at night with excuses that work had kept him. Mrs. Nichols began to question the petitioner about meeting another woman but never suspected he had killed anyone. She did not believe he had committed the Pulley rape and murder because he had never shown her any indication that he could behave that way toward another person. She concluded her testimony by stating that she had come to testify because she did not believe her husband deserved to die and implied that only God could make that decision.

On further examination, Mrs. Nichols testified she was still married to the petitioner and always considered him to be normal. She stated they had a normal sex life. Mrs. Nichols recalled telling detectives that she had asked her husband about the murder, and he told her it was an accident. She recalled telling her husband she had heard about the rapist and was concerned for herself and her younger sister's safety and that the petitioner advised her to tell her parents about her concerns.

The petitioner testified he was twenty-nine years old and had regularly attended church as a child. As far as he could recall, his parents had a "loving relationship." He was close to his sister, Deborah, and kept in touch with her until his arrest. He could not remember being treated "that bad" by his father but recalled the whippings his sister received because of her bed-wetting problem. He was close to his mother, who died when he was ten years old. Following his mother's death, he and his sister were placed in an orphanage. The petitioner could not recall being abused while in the orphanage. He believed the houseparents there were good people who came and went. He had become particularly close to a couple who were preparing to adopt him, when he was released and returned to live with his father, who seemed glad to see him again. The reason he and Deborah were placed in the home was never discussed.

The petitioner's father wanted him to get a job after the petitioner left the orphanage, but he decided to finish high school and got a job afterwards. He stated that the relationship with his father was difficult during high school because if he wanted to do anything outside the home there was always a fight because his father expected him to stay home and become the "man of the house." His father had girlfriends but did not bring them home while the petitioner was there. He later went

into the military and was honorably discharged. He met a girl named Carol and had a good relationship until she became pregnant with his child, and the couple began arguing. Upon being discharged, he got a job and cared for his daughter, but he and Carol later parted. He paid child support until he was arrested.

Before marrying his wife, the petitioner informed her he had been arrested for assault with intent to commit rape in 1984, pled guilty, and served time in jail. He agreed they had a good marriage and stated he still loved his wife. He enjoyed working at Godfather's and received several promotions from cook to assistant manager. When he began staying out at night and committing the rapes, he felt bad about his actions and about lying to his wife. He did not ask her for help because he knew telling anyone would only result in losing his wife and "everything else."

The petitioner testified he did not know Karen Pulley and did not intend to kill her; when he broke into the home, he was there to burglarize it and thought no one was home. He found Pulley sitting on her bed after going upstairs and attacked her. He knew he had hurt her during the struggle when he was trying to leave, and she was hanging on to him. The petitioner stated he would go out at night intending to do other things and a "strange feeling" would come over him, and he could not stop himself. He stated he confessed to the Pulley rape and murder because he was being questioned about "other things," and, after the relief of getting those things off his chest, he was called back in and then told them about Pulley. He did not learn she had died until questioned by detectives about the other rapes, and he became scared. He had "no complaints" about Detective Heck. He concluded he was not asking Pulley's family for forgiveness, which he did not expect, but stated he would change places with her if he could.

On cross-examination, the petitioner testified his sister was married with children and did not seem to be damaged due to her own experiences at the orphanage. He could not recall whether his father was abusive or mean to him. He had not had the same strange feeling since his arrest. He could not explain why on some nights he would commit the rapes and on others he would not. He did not enjoy the rapes. He began the roaming around at nights by himself in high school and continued to do this later when he was bored. He never considered after each rape that there would be a next victim because he felt normal most of the time. He agreed the assaults probably would have continued if he had not been arrested. He recalled telling Dr. Engum he confessed partly to get the crimes off his mind and partly because the detectives were trying to pin other crimes on him that he did not commit, and he wanted to set the record straight on what he had really done. The petitioner described a person who could discuss with his wife her fears about the rapes in the area while knowing he was the rapist as a "scared individual, a messed-up individual." The petitioner testified he did not take any steps to help Pulley, knowing she was hurt, but that he did take the time to dispose of the two-by-four and hide his bloody clothing. He continued to rape other women after the Pulley rape.

Dr. Eric Engum, a clinical psychologist, testified he evaluated the petitioner to ascertain his mental status and to discover the cause of his behavior. He met with the petitioner five or six times and also conducted several tests. He concluded that the petitioner had intermittent explosive disorder

(IED), a loss of control of behavior after the ability to resist an impulse was overwhelmed. A person with IED is highly aroused with no relief until the violent act is completed, often followed by guilt and remorse and resumption of an otherwise normal life. The subject sometimes has partial amnesia of events and usually a minimal history of antisocial acts. Reasons for the loss of impulse control are usually organic (i.e., brain injury) or due to developmental factors, with the latter including being raised in a hostile environment, abuse, lack of love in the family, and social isolation. In the petitioner's case, there was an aggressive, hostile father; figures with whom he had bonded being taken away; and a sense of abandonment. His self-concept seemed very poor, and he often engaged in self-defeating behavior, like losing good jobs. Lack of early childhood memories could be the result of repressing negative things. Dr. Engum stated that the petitioner was still childlike and seemed to function well in institutional settings and had basically always been in an institution of some type, from the orphanage to the military and then to prison.

As to the Pulley rape and murder and the other crimes, the petitioner was not a psychopath, a person who had set out to kill and was always violent and "evil." He seemed to be aware that eventually the acts would stop because he made no attempt to hide his identity during the rapes and knew he would be caught. Dr. Engum stated the petitioner's confessions could best be described as "the good side taking responsibility for what the bad side did." The best evidence that the petitioner was not a psychopath, but had intermittent explosive disorder, was that news of his assaults came as a complete shock to everyone who knew him. Dr. Engum noted that the diagnosis of IED was not offered as an excuse for the killing of Pulley, but as a way of understanding the petitioner's actions. He concluded that the petitioner was of "high average to bright normal" intelligence and fairly articulate. The petitioner had expressed a desire to positively impact "at least one person" during his life in prison.

On cross-examination, Dr. Engum stated he worked on the petitioner's case for eight months but was not asked to do a report on his findings until the day prior to his testimony in the penalty phase of trial. He had given defense attorneys ongoing verbal reports, however, and did not conclude his diagnosis until three weeks prior to testifying. Dr. Engum stated he interviewed the petitioner, his wife, his father, and ministers and attempted to interview his sister and relatives in Alabama who would not talk with anyone from the defense team. There was no question the petitioner's mind was working and that he made the decision to commit the assaults, but he was acting on an uncontrollable impulse at the same time. Dr. Engum felt the petitioner should remain incarcerated because he still had the disorder and would act on it again if ever released. As to his confessions, the petitioner admitted to everything he had done and did not try to hide anything. Dr. Engum felt the first time the impulse took over was in 1984 and that the petitioner was not "fine" and "everything wonderful" then, but explained that many psychosocial and personal variables brought him to that point. He stated one of the petitioner's greatest fears was that he would become violent with his wife. Dr. Engum agreed the IED diagnosis was quite rare. Dr. Engum, also an attorney, stated he was completely objective and did not consider himself to be a member of the defense team. He stated he was not searching for a defense, but if the explanation for the petitioner's actions led to one, that "was great."

Winston Gonia testified he was a minister who knew the petitioner at the age of ten.  He described him as "congenial" and stated the two had a rapport.  As far as Gonia knew, the petitioner still had the character of a good person.

Larry Kilgore testified he worked with the petitioner at Godfather's Pizza, and stated that the petitioner was a good cook and a dependable employee.  Kilgore asked the petitioner to work at the store in Red Bank when Kilgore became a manager, and later the petitioner was promoted to assistant manager and did night shifts and the paperwork.  Kilgore was social with the petitioner and his wife and stated the petitioner he knew was the "best friend" he ever had.  He felt the person who committed the crimes was not the person he knew; the latter was "totally opposite."  Kilgore said that his roommate, Chuck Mullins, called the police about the petitioner because he fit the newspaper description of the rapist, but Kilgore never believed the petitioner was the rapist.  Once the petitioner was arrested, Kilgore was shocked and would have believed it if the petitioner had said he was innocent.

On cross-examination, Kilgore stated the petitioner's wife would often call at night looking for him, and Kilgore believed the petitioner had a girlfriend, which accounted for the scrapes and bruises he sometimes had.

Reverend Charles Hawkins testified he was the pastor for the Nichols family in Chattanooga and had visited the petitioner at the orphanage many times.  He described the petitioner as a "very fine young man." Hawkins stated it was difficult to associate the person he knew with the crimes committed, and he still saw the petitioner as he would a son because he loved him.  Hawkins did not see remorse at first, once the petitioner was in jail, but stated he had changed and was not like other criminals he saw who always argued they had been framed.

At the post-conviction hearing, junior trial counsel testified as to her view of their proof at the mitigation hearing:

> We put on a great deal of mitigation evidence.  Wayne and Joann were two of the best mitigation witnesses that you could ever ask for.  Wayne was very truthful about his life and his background, Joann was.  The jury sat there and cried during Joann and Wayne's testimony.  And the ministers talked about the orphanage and the background and Mack Nichols and what a jerk he was.

During the hearings on the petitions for post-conviction relief, a number of witnesses testified.  The petitioner claims that these persons should all have testified during the penalty phase of the trial.  The witnesses, and their testimony, are as follows:

Winston Gonia, a pastor for thirty-three years and board member (1959 to 1962) of the Tomlinson Children's Home, an orphanage in Cleveland, Tennessee, and who had testified during the penalty phase of the trial, first became acquainted with the petitioner and his family in 1962 as

their pastor at the East Chattanooga Church of God of Prophecy where the petitioner attended church regularly with his grandmother. Mr. Gonia observed that the grandmother was affectionate toward the petitioner, while the father did not show emotion toward him or the family. Mr. Gonia left but returned to the Cleveland area in 1976 to find that in the intervening years the petitioner's mother and grandmother had died, and the petitioner and his sister, Deborah, were in the Tomlinson Children's Home even though their father was living. From talking to children who lived at the orphanage, Mr. Gonia opined that the home was "a very disciplined place." However, he never saw any abuse in the orphanage. At some point, the orphanage closed, and the petitioner returned to live with his father. He appeared to be well-disciplined and was outgoing and friendly. Mr. Gonia recalled being asked to testify for the defense at the petitioner's trial as a character witness and stating he felt the petitioner was "still a good person."

Diana Allred, whose mother was the sister of petitioner's father, testified that in 1961, at the age of eleven, after both her parents died by accidental drowning, she and her older brother, Royce Sampley, went to live with the petitioner's family where they stayed until 1967. Ms. Allred stated the family seemed happy and normal at first but after a few years, the petitioner's father would become enraged at times and "spank" his children. Ms. Allred saw Deborah, petitioner's sister, whipped "till the blood would run out of her legs" and stated petitioner was also spanked as he grew older. Mr. Nichols would curse his mother, the petitioner's grandmother, when she criticized him about his treatment of the children. Ms. Allred felt Mr. Nichols wanted her in the home to cook and clean, but otherwise it appeared he felt she and her brother were a hardship on the Nichols family. Ms. Allred testified when she was about fifteen years old, Mr. Nichols often sat on the couch undressed in the morning when she had to pass by in order to get ready for school. He also came into her bedroom undressed and asked if he could get in bed with her, while his wife was in the other bedroom crying and asking him to return to their bedroom. Ms. Allred recalled that the petitioner, his sister, father, and mother all slept in the same, regular-sized bed during the several years she lived with the family. After she had left the Nichols home, Ms. Allred was approached by a church pastor and agreed to remain silent about Mr. Nichols's behavior toward her in exchange for his allowing the petitioner and his sister to live in the orphanage. Ms. Allred testified the petitioner seemed like a normal child while she lived with the family. Later, when she had moved out and saw him and his sister in church, they both seemed frightened and shy, and she reasoned this was possibly caused by their frequent whippings. She never heard allegations that the petitioner was sexually molested. Ms. Allred did not have further contact with the petitioner or his family after 1971 when she moved to Alabama where media coverage of the petitioner's trials did not reach her. The petitioner did not know where she had moved.

Royce Sampley, Ms. Allred's older brother, described living with the Nichols family as a "threatening" environment. Mr. Nichols was "indifferent" to his own children and to Mr. Sampley and Ms. Allred. Mr. Nichols constantly acted angry and cursed and threw things in rages. Mr. Sampley moved out and was married in 1967. He stated he was not contacted about testifying at the petitioner's trial. Mr. Sampley testified he never saw Mr. Nichols sexually abuse his daughter or the petitioner while he was living in the home. Mr. Sampley moved to Texas in 1977 and stated the petitioner would not have known how to contact him at the time of trial. He learned about the

petitioner's offenses from another sister who called him, but he could not recall whether this was before or after the trial. He was contacted by the defense team prior to the post-conviction proceeding.

Juanita Herron, a cousin of the petitioner, testified the Nichols family would visit her family once a month while the petitioner was growing up. She observed that the petitioner was close to his mother and that after her death he became upset when night fell and it was time to go to sleep. Ms. Herron described the petitioner as always being "sad" and "disturbed" after his mother died. She testified that Deborah, the petitioner's sister, had reported to relatives that her father had tried to sexually molest her, and that Deborah had told Ms. Herron the allegations were true. As a result of these reports, relatives arranged to have the petitioner and his sister removed from the home and placed in the orphanage during which time she did not have contact with the petitioner. She had not seen the petitioner since he was nineteen years old. She stated that no one from the defense team contacted her prior to the petitioner's trial, but the petitioner knew where she lived and could have contacted her at the time of the trial.

Margaret Crox testified she had lived next door to the petitioner in Chattanooga when he was a young child. She recalled that as a child he was loving and affectionate and that his mother seemed to be a good, spiritual woman. She knew little about his father, other than he seemed to take no interest in his family. She did not believe she was contacted by anyone about the petitioner's trial.

Linda Crox Johnson testified she and her family lived next door to the Nichols family. She recalled that the petitioner and his sister seemed very close, but did not remember other children ever visiting, and it did not seem that Mr. Nichols was very concerned about his children.

Claude Nichols, the petitioner's uncle, testified that he was the younger brother of the petitioner's father. When he was four, his brother ten, and their sister a baby, their father left their mother. He recalled his brother, Wayne Nichols, the petitioner's father, as having a fine reputation in the community, that he was a hard worker, helped support the family, and did not have much of a childhood. As to the petitioner and his sister's going to the orphanage, his brother told him that the church was responsible for the decision and no allegations of abuse were mentioned at the time. He stated he attended a pretrial hearing of the petitioner in 1988 on an attempted rape charge. He did not know of the murder charge against the petitioner until after the trial and sentencing. He visited the petitioner in prison in Nashville and asked whether he committed the crimes, and the petitioner responded "yes." He was not contacted by anyone about the trial except for the petitioner's father, who told him about the pretrial hearing, and who was then living with him.

Louella Wagoner, a cousin of the petitioner, visited with the petitioner as a child and recalled that his father was very stern and strict. The petitioner and his sister did not have friends over and were made to stay on the front porch or inside the house when they played.

Jim Gumm testified he attended school with the petitioner from the seventh grade until they were sophomores in high school and still considered the petitioner a friend. He recalled inviting the

petitioner over to his house, but he was not allowed to go because Mr. Gumm's family was not part of the Church of God of Prophecy, which operated the orphanage. In school, he thought the petitioner was "one of the nicest guys around" and "he never got in trouble." No one contacted him prior to the petitioner's trial. Mr. Gumm testified he had remained and still lived in Cleveland but had no information about the petitioner or contact with him since the petitioner left the orphanage in the tenth grade. He was aware of the media coverage of petitioner's crimes.

Nancy Atchley testified she taught the petitioner in the seventh and eighth grades. She recalled he was a kind, gentle, sweet little boy who was well-mannered, quiet, and always smiling. He once gave her a gift which she particularly recalled because she had special memories of the boys from the orphanage. She stated the petitioner appeared to be well cared for although he was quieter than the other boys. She recognized him later when media coverage of his trial began but had had no contact with him since 1975. She stated she would have come to testify at his trial if asked.

Pamela Taylor testified she was employed at the Chattanooga Community Service Center, a minimum security prison, as an inmate jobs coordinator. She was employed by the public defender's office on a limited, part-time basis to conduct interviews on the petitioner's case. She made visits to the orphanage to gather names and contacts regarding the petitioner and conducted about a dozen interviews over a one-month period. She learned about the history of the operation of the orphanage and its policies that the church children were to be kept apart from people outside the church and their activities monitored. A houseparent's guide outlined how corporal punishment with a paddle could be carried out. She assisted in locating the Sampleys, the cousins who had lived with the Nichols family. Ms. Taylor testified she was aware the petitioner's trial attorneys had gathered a file on him from the orphanage but stated her investigation was more on the orphanage's operations and archived information.

Jacqueline Boruff testified that she lived near the petitioner, and her son was friends with him when the petitioner was fourteen or fifteen years old. She recalled him as being sweet and helpful around her own home. She described his mother as very sweet and his father as "an ass," who was very fanatical, cold, and uncaring. She never knew the petitioner to be violent or to drink or curse. She described him as less talkative after he returned from serving in the military. She was not contacted after the petitioner's arrest and had no contact with him since then. She testified that she was "shocked" when he pled guilty to the rapes and the murder.

Jackie Bailey, an academic and personal counselor, worked at the Tomlinson Children's Home from 1974 to 1977. She counseled Deborah Nichols but could not remember ever speaking with the petitioner and had no information about the petitioner or his background. She knew Deborah was very protective of the petitioner and wanted him to come live with her after she moved out and was married, but that did not happen. She did not know of any other children from the home who had gone to prison since leaving, but stated some of them did have problems.

Connie Westfall, an investigator for the post-conviction defender's office, testified she investigated the petitioner's prison records from his 1984 incarceration. She found no disciplinary

write-ups. He was a good worker, according to prison supervisors. She was not aware whether similar information was provided at trial to defense counsel. She never spoke with trial counsel or with Dr. Engum.

Kay Mann testified she was a regional director for the Tennessee Board of Paroles. She recalled the petitioner was a very quiet, polite person at the time of his 1984 parole. The petitioner generally did what was required of him, but parole was revoked for failure to notify officials of his new address and for a prowling charge. The petitioner was on parole at the time of the Pulley rape and murder.

John Swope testified he had been employed with the Hamilton County Sheriff's Department since 1978 and was so employed at the time of the petitioner's incarceration as a result of the cases at issue. He knew of no disciplinary problems with the petitioner during his two-year incarceration at the jail. He was not contacted by defense counsel to testify at petitioner's trial.

Linda Melton was a former houseparent at the Children's Home and knew both the petitioner and his sister. She described them as close. She remembered Deborah Nichols as moody and was aware that she had a bed-wetting problem. She described the petitioner, fifteen years old at the time, as a "sweetheart" and had no problems with him. She never recalled the petitioner's father visiting him or otherwise communicating with him at the Home. Melton testified the church forbade children in the Home from having much contact with "the outside world," and that activities were mostly church-related. She stated that discipline in the girls' section of the orphanage usually involved being assigned more chores and that paddling was not used when she was a housemother. She did not see the petitioner ever paddled at the orphanage while in the Home and testified that if the relief houseparents had paddled the children, she would have heard about it from the children. She was not asked to testify at the petitioner's trial or contacted by defense counsel.

Dennis Sampley testified he was the petitioner's cousin and the brother of Royce Sampley and Diana Sampley Allred. He lived in Cleveland at the time of the petitioner's trial and was contacted by a "lady" from the defense team regarding his background at least two or three times prior to the trial. The lady did not ask Sampley if he knew how she could contact his brother or sister. He did not offer much about the petitioner's background because he was not familiar with it. Sampley had also lived in the orphanage after his parents were killed and was not sure if the petitioner later had the same houseparents he had had. He stated he received very rough whippings on more than one occasion and was never allowed to talk about what happened in the Home. He testified other children received the same type of beatings. Sampley could not say whether the petitioner was ever beaten by any houseparents. He summarized the orphanage as a "hellacious home." As to why he had not been called as a mitigation witness during the penalty phase of the Pulley trial, junior trial counsel testified that she was concerned about the prosecutor's cross-examination of him as to whether he had committed crimes because of brutal treatment at the orphanage.

Dr. Kenneth Nickerson, a clinical psychologist, testified he had evaluated the petitioner in April and May 1989 while working at Joe Johnson Mental Health Institute. He identified a letter to the district attorney's office requesting that the institute be provided with the petitioner's social history for use in the institute's evaluation of him for competency and sanity. It would have been standard practice to also send a copy to defense counsel. He administered the Rorschach psycho diagnostic ink blot test to the petitioner, and his evaluation was based on this test. He also conducted an interview with the petitioner that was used as the primary instrument for determining competency to stand trial. In the petitioner's case, the social history came from the petitioner himself. The petitioner had also been interviewed there by another psychiatrist, Dr. Fausto Natal, and by the forensic coordinator. Reading from the notes of Dr. Natal, Dr. Nickerson said that, at the time of Dr. Natal's interview, the petitioner denied murdering any of his victims. Based on the petitioner's previous criminal charges, Dr. Nickerson noted in his report that it was "interesting" that the petitioner had not previously shown signs of "intense or explosive emotions." Dr. Nickerson's report concluded that the petitioner was not legally insane. He did not recall being contacted by the petitioner's trial attorneys, but noted there was a request by them for a complete report from his and Dr. Natal's files, which was provided. Upon cross-examination, Dr. Nickerson stated his report was that the petitioner was not insane and was competent to stand trial. He agreed there were no specific mental diseases or major disorders identified regarding the petitioner, although this was not the purpose of the evaluation. However, the petitioner was found to have problems with interpersonal relationships. He stated it was very common for people being evaluated to deny guilt for the crimes they are charged with.

Dr. David Solovay, who is a clinical psychologist, testified as an expert in forensic psychological services. He had worked on eleven other capital trials. His work on the petitioner's case was the first to review the prior evaluation by Dr. Engum and also to review the pretrial competency/insanity evaluation. After reviewing Dr. Engum's case notes, evaluation, assessment tools, tests, reports, and Dr. Engum's trial testimony, he stated he was concerned about Dr. Engum's focus in the trial, in that Dr. Engum did not identify himself as a member of the defense team while testifying, which might have hurt his credibility. Further, he felt Dr. Engum was explaining to the jury how a person could do the things the petitioner did, rather than portraying the personal side of the petitioner as a mitigating factor. He testified that in his experience it was up to the attorneys hiring him to direct him as to their objectives. He perceived the information brought up through Dr. Engum's testimony and report as more aggravating than mitigating information. He noted that Dr. Engum's diagnosis came only three weeks prior to trial. Dr. Solovay observed that Dr. Engum and Dr. Nickerson "did a fine job" and noted his own data on the petitioner was very similar to the data they used, although his history and background of the petitioner was much more detailed. Dr. Solovay stated it appeared all of them had difficulty assessing the petitioner, who presented a difficult case. He opined that the petitioner was a person who had learned to disassociate or disengage from stressful or threatening situations. This was typical for persons who had been abused. Dr. Solvay did not see evidence of intermittent explosive disorder which is indicated by repeated "discrete experiences of just blowing up and acting out of control." He diagnosed the petitioner as having borderline personality disorder which is usually treated with medications.

Upon further examination, Dr. Solovay testified that in preparing his own mitigation reports for attorneys' use, he would submit a "preliminary report" to them, and, if the same report were later used during his testimony, he would resubmit the report, even if it were unchanged, and eliminate the "preliminary" designation. The doctor testified that the petitioner denied that he was ever sexually molested. As to his diagnosis of impulse control disorder, Dr. Solovay described this as an inability to control a particular desire, not a complete loss of conscious awareness of what one is doing. Dr. Solovay agreed that his report that the petitioner had shown sorrow, remorse, and personal guilt for his crimes might indicate an acceptance and responsibility for the crimes. The report also noted that the petitioner "acknowledged his wrong doing at an early stage of the arrest" and showed a "willingness to plead guilty."

Dr. Frank Einstein testified as an expert in mitigation issues. He had been a sentencing consultant since 1987. He had worked on more than forty capital cases beginning in 1988 and was sometimes referred to as a "mitigation specialist." He normally worked with attorneys in preparation for sentencing hearings and did not usually testify himself. He defined the effort behind mitigation preparation as trying to "explore a person's life, find out what were the series of events that led up to, to a horrible crime." When retained by attorneys as a sentencing consultant, he tried to present the story of a person's life to a jury to let them know the whole picture about the person. Once a report was prepared, including a social history of an offender, it would set out for attorneys any significant issues and any areas where a specific type of expert might be useful. The sources for his report were interviews with the defendant and people who knew him, records and other documentation about the defendant, and literature. Finalizing a report on the defendant involved reinterviewing people as issues developed. The end result was a social history that the attorneys could use to develop trial strategies. In the petitioner's case, Dr. Einstein took information already assembled by post-conviction counsel and organized it to focus on the mitigation issues. He did not test the accuracy of the information he was given, but used it to prepare his "time line" of the petitioner's life. Significant events in the petitioner's life included: the petitioner's not remembering anything before the age of ten to twelve, which might indicate traumatic events occurred before then; the Sampley cousins' moving in with his family; his being subjected to emotional and physical abuse in the home; the deaths of his mother and grandmother, his protective figures; and his being placed in the orphanage. There was no indication from anyone during his childhood that the petitioner had any behavioral problems. Many described him as changed after his military service.

Dr. Einstein had reviewed the notes of Dr. Engum and investigator Cohan and observed that they had identified all the major issues to be raised about the petitioner's life. The notes indicated that a good social history should be developed and persons identified who could provide information. Einstein opined that trial counsel presented little information about the petitioner other than what the petitioner himself related to them. No one was presented who could portray him as a bright, happy child, nor were rumors of "serious problems" in his home and in the orphanage developed. Relatives were not called to "humanize" the petitioner for the jury. The main mitigation themes he identified were: problems in his home and with his father; being subjected to physical abuse; the "prevalence" of sexual abuse in the home; the isolation of the family from others; the

failure of protection for the petitioner and his sister; the petitioner's positive adjustment to incarceration; and many humanizing details about him that could have been presented to the jury.

Upon cross-examination, Dr. Einstein testified that he did not recall discussing mitigation issues with trial counsel prior to the trial. He agreed the trial attorneys identified most of the same significant mitigation issues that he explored in his report. He opined that mitigation was not properly presented at trial, because the link between the petitioner's childhood and how he came to commit the crimes was not established. Mitigation tries to answer why this terrible crime happened. He agreed that if jurors cried while the petitioner testified, they were being "moved" during the proceeding, but did not concede this meant the presentation was effective. He stated while it was important to uncover everything, everything did not necessarily need to be presented. Einstein stated it was the attorneys' job to decide what to present and agreed it was hard to second-guess their decisions. He admitted some mitigation "themes" had negative flip sides to them. Einstein stated he had over a year to work on the petitioner's post-conviction case. He agreed his role was to assist in presenting a picture that would avoid the jury's imposing a death sentence on a defendant. He stated it was more than gathering information and identifying issues, but developing those into a theme. Dr. Einstein stated he did not speak with the trial attorneys or investigator about the mitigation themes they decided to pursue.

Deborah Nichols Sullivan, the petitioner's sister, testified by video deposition. She stated that when her cousins came to live with the family, they were living in a three-bedroom house and one cousin slept on another makeshift bed in a back room. She stated her parents slept in the great room, and the petitioner may have slept in another corner of the great room. She had a room, and her cousin and grandmother shared another room, each with twin beds.

She loved her brother and tried to care for him. She and the petitioner always played together and were not generally allowed to have other friends. Before her mother died, the children attended church with their mother and grandmother, but their father did not usually attend. She did not recall any discipline problems she or her parents ever had with the petitioner. She recalled him as a "red-headed, freckle-faced, blue-eyed kid" with a mild demeanor, always quiet, and recalled his holding his mother's hand when she became ill with cancer. She stated her brother had a "sleepy eye" and a speech impediment when he was young, and once was hospitalized with double pneumonia. She stated that it seemed the petitioner was close to his father as a young child but later the petitioner wanted to stay out at night and did not feel he had to have a reason. She recalled being afraid of her father's intense spankings with switches and was "sure" the petitioner was also spanked but could not recall any specific incidents. She stated her father drank "very little," and she never saw him drunk.

There were allegations that her father abused her, but no allegations about the petitioner's being abused. She did not confirm she was abused but stated her father's household was "mentally trying" because of the spankings, the worst of which left welts and stripes. She stated she did not spank her own three children the same way her father had spanked her. She could not recall a time when she was not afraid. She refused to discuss allegations or to confirm or deny that her father

sexually abused her but stated "that would be me and not Wayne" (the petitioner) repeatedly. Later her mother died, and she and the petitioner were placed in the orphanage and told that if people asked why they were placed in the orphanage that it was because their father could not care for them.

Regarding the orphanage, Deborah stated at first the boys were on one side of town and the girls on another, and she only saw the petitioner at church. Later they were both placed in the same area but in different buildings close to each other.

She did not recall speaking with the trial attorneys before, during, or after the trial. She stated that "they probably called the house," but she did not speak with them. Her husband informed her that attorneys had called her and were trying to contact her at the time of the trial. She stated if they left a number, she never called them back.

Junior trial counsel described why the petitioner's sister had not testified during the penalty phase:

> Because I spoke with her and her husband on the phone a number of times. I don't know how many, maybe two, maybe three. But I talked to her at length and it was interesting, what we had hoped that Debbie could testify to was a little more about Wayne's background and the orphanage and primarily about this abuse of the father, and this lady was the most unwilling witness that you would ever want to put on the stand. She dearly loved Wayne it appeared to me, but she was not going to take the stand if she could help it. And I realized I could get her there, but she was not going to take the stand and she was not going to talk about any abuse in their family. And what she told me is, "There is nothing I can tell you that would help Wayne, if there was, I would be there." Her husband then got on the phone and told me that she was not going to testify, under no circumstances.

> I sat down with Wayne, we talked about it, I went back and called them again, got the same stuff, sat down and talked with Wayne again and with Wayne's assistance we decided that the better thing to do was not to call her because it wasn't going to add anything and we were afraid of what it might do to hurt us. And Wayne didn't want her called. He didn't want her to have to go through it.

Arlyne McGriff testified by deposition. She stated she was eighty years old and not well. She testified that she had previously signed an affidavit stating that she and her husband lived in Cleveland, Tennessee, in 1990 at the time of the petitioner's trial. She and her husband were members of the Church of God and were houseparents at the orphanage just before it was closed. She recalled that the petitioner and four other boys were at the home then. While at the orphanage,

-73-

the petitioner often talked about his mother but not his father. The petitioner never caused her problems but was afraid of the dark. She stated the petitioner's father visited two or three times while she was there. She related that at one point the orphanage boys were taken to the mall and given money to spend, but when she returned, they were still in the same place and had not spent any of the money. She stated maybe they did not know what to do or were afraid. She recalled there was "conversation" with her husband about their adopting some of the remaining boys, but eventually the petitioner's father applied to take the petitioner home again. McGriff testified that she and her husband drove the petitioner to his father's home and upon arrival, the petitioner and his father shook hands. She stated the petitioner was a good person. She last saw the petitioner just before he was married. She was not contacted about the trial.

As to these additional witnesses, and the petitioner's claim that ineffective assistance of counsel occurred when they were not presented as witnesses during the petitioner's trial, the post-conviction court concluded:

> Petitioner presented numerous relatives and acquaintances at the hearings in this matter to demonstrate the amount and type of mitigating evidence which was not presented at the sentencing hearing in the original trial. Summaries of their testimony has [sic] been provided in an appendix to these findings. Many of these witnesses, however, were cumulative and only expounded on issues which were raised through the evidence presented by trial counsel at the sentencing hearing, i.e., the evidence was "substantially similar" to the mitigating evidence previously presented to the jury. See discussion of Goad v. State, supra at 4. The psychologist retained by post-conviction counsel even testified that while he may have had more personal history in conducting his evaluation, it was essentially the same kind of information Dr. Engum and trial counsel had at the original trial.
>
> The issue of the abusive environment in which the petitioner grew up was addressed at the petitioner's sentencing hearing. See State v. Nichols, 877 S.W.2d at 737. The new witnesses who testified here would thus have been cumulative and the prejudice is not apparent. In addition, the allegations of sexual misconduct related to the petitioner's sister were also raised at the motion for new trial. It was determined then and on direct appeal that the evidence was additional evidence on the issue of the abusive home environment which already had been raised by the evidence. Id. Most of the evidence related to these claims was hearsay and it is noted that the petitioner did not himself testify to these alleged incidents and apparently has no memory of them. See Appellate Record, sealed affidavits. The documents also state and the trial court found that petitioner and

-74-

counsel made a diligent effort to find this type of information prior to trial but were unable to find any witness who would state more specific facts about any abuse. Id. The documents demonstrate that petitioner told investigator Cohan that his father disciplined them but not really beyond what he thought was the parental norm. He also told his defense team about the orphanage and stated that he had not been treated badly there. He even told them about one set of houseparents who considered keeping him when the orphanage was closing but that he was taken back to his father instead.

Many of the witnesses testified that they were not contacted and that the petitioner probably did not know how to contact them. Some witnesses, however, testified that the petitioner knew how to contact them but that they received no contact and did not step forward on their own. Using 20-20 hindsight more witnesses may have been preferable; based upon all the evidence and documentation, however, this court finds that counsel was not derelict in their investigation of this case and that no prejudice has been shown. The evidence indicates that many witnesses were unwilling to talk to counsel about many of these matters during the time frame of the petitioner's original proceedings. See discussion of Goad v. State, supra at 4. Any additional witnesses would for the most part have been cumulative or the weight of their testimony would have been minimal. The aggravator of prior violent felonies was very substantial. Id. It is also noted that this factor could be even more substantial at any resentencing hearing because the petitioner subsequently pled guilty to additional offenses.

Thus, the trial court found that many of the mitigation witnesses who testified at the post-conviction hearing were "cumulative" and, because the evidence was "substantially similar" to that presented to the jury at the sentencing phase, that no prejudice was established by the failure to call additional mitigation witnesses. The court further observed that the petitioner himself did not testify to allegations of sexual abuse involving either himself or his sister and apparently had no memory of such incidents. Further, the petitioner did not believe that his father disciplined him beyond what he considered normal discipline, and testified that his treatment at the orphanage was not bad. The court concluded that, in hindsight, "more witnesses may have been preferable; based upon all the evidence and documentation, however, this court finds that counsel was not derelict in their investigation of this case and that no prejudice has been shown."

"Clearly, trial counsel has a duty to investigate and prepare for the penalty phase of a capital trial since 'evidence about the defendant's background and character is relevant because of the belief . . . that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems may be less culpable than defendants who have no such

excuse.'" Henley v. State, 960 S.W.2d 572, 582 (Tenn. 1997) (quoting California v. Brown, 479 U.S. 538, 544, 107 S. Ct. 837, 841, 93 L. Ed. 2d 934 (1987)).

The post-conviction court summarized the additional testimony which the petitioner asserts should have been presented during the guilt phase of the Pulley trial, and the petitioner has specified additional testimony for most of these witnesses which he believes is relevant to his claim that he received ineffective assistance of counsel during the guilt phase. We have reviewed the testimony and do not agree that what the petitioner labels as "new evidence introduced at post-conviction" would have been of substantial value to the petitioner. Trial counsel's not presenting this additional evidence certainly does not constitute ineffective assistance of counsel.

There is no indication that trial counsel failed either to adequately investigate or to present mitigation evidence on the petitioner's behalf. While additional witnesses at the post-conviction hearing presented testimony in greater detail regarding life in the Nichols home and the orphanage, none of the witnesses testified to observing the petitioner being abused, sexually or physically, although the petitioner's cousin stated he may have received whippings when he was "older." The petitioner himself testified that he felt he received normal discipline from his father and did not recall being abused in the orphanage. The petitioner stated the reason he and his sister went to the orphanage was never discussed. He recalled that his sister received whippings because of a bed-wetting problem.

Testimony of sexual abuse in the Nichols home involved the petitioner's father exposing himself to the petitioner's cousin, Diana Allred, and requesting to get into bed with her. Ms. Allred stated that when Mr. Nichols exposed himself to her, the petitioner would be in another room. The extent of any testimony concerning sexual abuse of Deborah Sullivan also came from Diana Allred, who testified that Deborah told her the allegations were true, but would not discuss them further. The petitioner testified his sister had moved, married, had children, and did not seem to be damaged by any treatment she received in the orphanage.

At the sentencing hearing, the jury was made aware of the petitioner's life in the Nichols home and in the orphanage, and heard details on the rest of his background until and following the commission of the offenses. And, while Deborah Sullivan may have been able to offer more insight into the petitioner's childhood and upbringing than anyone, she was not cooperative with trial counsel. Counsel testified they attempted, more than once, to get Deborah Sullivan to testify regarding any abuse she and the petitioner had experienced, but she refused. Ms. Sullivan did not recall speaking with the trial attorneys, but was aware that they had been trying to contact her at the time of the trial. Junior trial counsel stated she spoke with Deborah and her husband, who stated she would not testify under any circumstances.

Additional witnesses who testified at the post-conviction hearing certainly offered more insight into the petitioner's background, but were unable to offer testimony that the petitioner himself was ever physically or sexually abused, with the exception of his cousin's testimony that he was whipped when he was "older."

The petitioner's claims as to ineffective assistance of counsel during the penalty phase are substantially unlike those in Goad v. State, 938 S.W.2d 363, 365 (Tenn. 1996), in which there were a single aggravating circumstance and convictions for six major felonies; and the defense theory was that "Goad's experience in Vietnam had drastically changed him from a model citizen to a violent, mentally ill criminal." Id. In Goad, the court concluded that trial counsel was ineffective for failing to adequately investigate and explore an evaluation of Goad by the Veterans' Administration and his symptoms of post-traumatic stress disorder. Counsel's failure in this regard was determined to be "not 'the result of reasonable professional judgment' and 'fell outside the wide range of professionally competent assistance.'" Id. at 371. The court outlined the considerations for assessing claims that counsel was ineffective for failing to present mitigation evidence during the penalty phase of a capital trial. First, the court must analyze "the nature and extent of the mitigating evidence that was available but not presented." Id. The next determination to be made is "whether substantially similar mitigating evidence was presented" in the guilt or penalty phases. Id. Finally, the court considers whether "there was such strong evidence of aggravating factors that the mitigation evidence would not have affected the jury's determination." Id.

Applying the holdings in Goad and Henley, it is clear that trial counsel's not presenting the additional information detailed by the petitioner available either through witnesses who testified during the penalty phase or witnesses who testified at the post-conviction hearing, did not constitute ineffective assistance of counsel. This is made certain by applying the three-prong test utilized in Goad and Henley. As to the first prong, the "nature and extent" of the mitigating evidence available but not presented, the record fully supports the post-conviction court's conclusion that much of this evidence was "cumulative and only expanded on issues which were raised through evidence presented by trial counsel at the sentencing hearing." As the post-conviction court also notes, many of the witnesses proffered at the post-conviction hearing had been uncooperative and difficult to contact at the time of the petitioner's trial. His trial counsel testified as to the reasons they presented the witnesses which they did and their efforts to develop additional proof. Much of the additional proof regards the issue of the abusive home environment of the petitioner, and, as discussed by the post-conviction court, proof in this regard was developed by trial counsel. Thus, as to the first two of the factors set out in Goad and Henley for determining prejudice, we conclude that the record supports the post-conviction court's conclusions that the proffered evidence tended to be cumulative and similar to evidence actually presented by trial counsel.

Our third consideration in this regard is "whether there was such strong evidence of aggravating factors that the mitigating evidence would not have affected the jury's determination." Id. at 371. The post-conviction court concluded that "[t]he aggravator of prior violent felonies was very substantial." We agree with this conclusion. The petitioner has failed to show a "reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Strickland, 466 U.S. at 695, 104 S. Ct. at 2069.

This assignment is without merit.

-77-

**E. Petitioner was Denied Effective Assistance of Counsel by the Failure of His Trial Counsel to Object to Improper Argument and Cross-Examination by the Prosecutor and Failure to Raise Prosecutorial Misconduct in the Motion for a New Trial or on Appeal**

The petitioner argues that the prosecutor in the Pulley trial asked a series of questions designed to bring out the fact of the prior rapes being used as underlying convictions to support the "prior violent felony" aggravator, and specifically to elicit the facts of those prior convictions in violation of State v. Bigbee, 885 S.W.2d 797 (Tenn. 1994). The petitioner asserts trial counsel failed to object to questions which brought out facts of the P.G., P.R., and S.T. rapes and the type of weapons used in connections with these assaults, and later failed to raise this issue on appeal.

The State responds that this issue is being raised for the first time on appeal and was not addressed in the trial court's findings of fact and conclusions of law and the issue is thus waived. Tenn. Code Ann. § 40-30-206(g). In the alternative, the State argues that the objectionable comments made by the prosecutor herein are distinguishable from those presented in Bigbee. The State contends here that no improper questioning occurred, and thus there was nothing ineffective about trial counsel's failure to object to the questions or to raise the issue on direct appeal.

The post-conviction court did not specifically address this issue, but found that there was no merit to petitioner's broad allegations that counsel failed to object to improper, misleading statements by prosecutors which allegedly diminished the jury's role in imposing the death sentence.

In Bigbee, the court reversed the sentence of death and remanded the case for a new sentencing hearing based on improper closing argument of the prosecutor informing the jury that the defendant had received a life sentence for his conviction of a previous murder, and on his extensive references to the facts of the previous murder, although the conviction on its face indicated that it involved violence. Further, the court found improper the prosecutor's strong inference to the jury that it could properly punish the defendant with a death sentence for a crime for which he had previously been sentenced to life imprisonment. Bigbee, 885 S.W.2d at 811-12.

However, the court specifically recognized that when a previous conviction, which the prosecution sought to utilize as an aggravating circumstance, did not show on its face that it involved violence or the threat of violence to the person, testimony to establish these facts could be presented to the jury:

> Evidence of the facts regarding a previous conviction to show that it in fact involved violence or the threat of violence to the person is admissible at a sentencing hearing in order to establish the aggravating circumstance. *State v. Bates*, 804 S.W.2d 868, 879 (Tenn. 1983); *State v. Moore*, 614 S.W.2d 348, 351 (Tenn. 1981). However, it is not appropriate to admit evidence regarding specific facts of the crime resulting in the previous conviction, when the

> conviction on its face shows that it involved violence or the threat of violence to the person.  Id.

Id. at 811 (footnote omitted).

In the instant case, during the cross-examination of the petitioner in the penalty phase, the prosecutor neither made reference to the sentences the petitioner received for his prior rape convictions nor did he insinuate that the jury should impose the death penalty for the petitioner's crimes, other than the Pulley murder.  The prosecutor did make reference to the other rapes and that each involved some type of weapon, including a gun, a knife, and a candlestick.  The complained-of questioning occurred during the prosecutor's cross-examination of the petitioner in the sentencing hearing:

> Q:  Mr. Nichols, December the 21st, 1988, after Karen [Pulley] was already raped by you, you went out and raped again, didn't you?
>
> A:  Yes, sir.
>
> Q:  [P.G.] in East Ridge, and you used a knife to rape her, didn't you?
>
> A:  Yes, sir.
>
> Q:  A knife that you got out of her kitchen.
>
> A:  Yes, sir.
>
> Q:  She was home alone, wasn't she?
>
> A:  Yes, sir.
>
> Q:  A few days later, December the 27th, 1988, you raped again, didn't you, Mr. Nichols?
>
> A:  Yes, sir.
>
> Q:  That was in Red Bank.
>
> A:  Yes, sir.
>
> Q:  And you used an electrical cord.
>
> A:  Yes, sir.

Q: January the 3rd, you raped again, didn't you, Mr. Nichols?

A: Yes, sir.

Q: Twice.

A: Yes, sir.

Q: [P.R.].

A: Yes, sir.

Q: Raped her twice, didn't you?

A: Yes, sir.

Q: [S.T.]. Both of those young girls lived in East Ridge where you lived, where your wife lived. And on [S.T.] you used a pistol, didn't you, and a knife?

A: No, sir, I didn't use a pistol.

Q: There was a pistol there that she attempted to use on you and you took away from her, didn't you?

A: Yes, sir.

Q: But you did use a knife, didn't you?

A: Yes, sir.

The petitioner's previous convictions were for aggravated rapes. Tennessee Code Annotated Section 39-13-502 defines aggravated rape as follows:

(a) Aggravated rape is unlawful sexual penetration of a victim by the defendant or the defendant by a victim accompanied by any of the following circumstances:

(1) Force or coercion is used to accomplish the act and the defendant is armed with a weapon or any article used or fashioned in a manner to lead the victim reasonably to believe it to be a weapon;

-80-

(2)   The defendant causes bodily injury to the victim;

(3)   The defendant is aided or abetted by one (1) or more other persons; and

(A)   Force or coercion is used to accomplish the act; or

(B)   The defendant knows or has reason to know that the victim is mentally defective, mentally incapacitated or physically helpless.

Because aggravated rape can occur, for example, where the defendant knows that the victim is mentally defective, the State submits that the petitioner's aggravated rape convictions on their face do not establish that they involved violence or the threat of violence to the person. The State thus asserts that sufficient facts could be properly brought forth to establish that the prior rape convictions in fact involved violence or the threat of violence to the person.

Pursuant to Tennessee Code Annotated Section 39-13-204(a), evidence establishing aggravating circumstances may be presented at the sentencing phase. Subpart (c) of that section provides that "[i]n all cases where the state relies upon the aggravating factor that the defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person, either party shall be permitted to introduce evidence concerning the facts and circumstances of the prior conviction." Tenn. Code Ann. § 39-13-204(c). There was no improper argument or inference regarding the petitioner's previous conviction under Bigbee, and thus no ineffective assistance through counsel's failure to raise objections to the prosecutor's cross-examination of the petitioner is established. See also State v. Chalmers, 28 S.W.3d 913, 918 (Tenn. 2000) (stating that in a capital case, intent of prosecutor not improper in introducing testimony of previous victim of defendant to rebut defense claims that evidence of the prior convictions was insufficient to identify the defendant as the perpetrator, the evidence of the crimes being presented during the sentencing hearing).

Additionally, the petitioner argues that the State improperly cross-examined him regarding the crimes by what "care and concern" he showed to Karen Pulley, P.R., P.G., S.T., or T.R., claiming that counsel were ineffective for not objecting to this short series of questions. We have examined these questions as well and given the context, that they followed the petitioner's admission that in making his confessions, he was, "to an extent," concerned about himself, we conclude that, even if improper, these questions and answers did not affect the outcome of the proceeding. See Harrington v. State, 215 Tenn. 338, 340, 385 S.W.2d 758, 759 (1965); Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976).

The petitioner also argues that counsel were ineffective for failing to object to improper comments made by the State in its closing argument in the Karen Pulley trial. During one portion of its closing argument, the State exhorted the jury to show the petitioner no more mercy than he had shown his victim, stating:

> [Senior Counsel] says you can consider mercy. You can consider mercy. And I ask you to show Harold Wayne Nichols mercy. I ask you to show Harold Wayne Nichols the same mercy that he showed Karen Pulley when she was there struggling [sic] and fighting for her life. You show him the kind of mercy he showed her.

The petitioner asserts that the State's comments "appealed to the jury to avenge the death of Karen Pulley."

In general, closing argument is subject to the trial court's discretion. State v. Middlebrooks, 995 S.W.2d 550, 557 (Tenn. 1999). Counsel is afforded wide latitude in presenting closing argument to the jury. Id.; see State v. Cribbs, 967 S.W.2d 773, 783 (Tenn. 1998); State v. Bigbee, 885 S.W.2d 797, 809 (Tenn. 1994); State v. Cone, 665 S.W.2d 87, 94 (Tenn. 1984), cert. denied, 467 U.S. 1210, 104 S. Ct. 2400, 81 L. Ed. 2d 357 (1984). The State's closing argument, however, should be "restrained and reasoned, fairly based on the evidence, and not merely an appeal to the bias or emotional responses of the jury." State v. Burns, 979 S.W.2d 276, 282 (Tenn. 1998) (citing State v. Nesbit, 978 S.W.2d 872, 891 (Tenn. 1998)). We agree with the petitioner that the State went beyond the bounds of acceptable argument by telling the jury to show the petitioner the same mercy that he had shown his victim. See Bigbee, 885 S.W.2d at 811 (finding prosecutor's statement "encouraging the jury to give the defendant the same consideration he had given his victims" improper). We do not agree, however, that these improper comments comprised reversible error, or that trial counsel's failure to object to them constituted ineffective assistance of counsel.

The test for determining whether a prosecutor's improper comment constitutes grounds for reversal is whether "the improper conduct 'affected the verdict to the prejudice of the defendant.'" Middlebrooks, 995 S.W.2d at 559 (quoting Harrington, 385 S.W.2d at 759). Factors relevant to this determination include: 1) the conduct complained of viewed in context of the facts and circumstances of the case; 2) the curative measures undertaken by the court and the prosecution; 3) the intent of the prosecutor in making the improper statement; 4) the cumulative effect of the improper conduct and any other errors in the record; and 5) the relative strength or weakness of the case. Id. (citing Bigbee, 885 S.W.2d at 809).

The improper comment here comprised only a small portion of the State's lengthy closing argument, and was, in part, invited by senior counsel's request that the jury show the petitioner mercy. There was no indication that the State acted in bad faith by making the comment. Considering the complained-of conduct in light of the entire case, including the strength of the evidence from which the jury could find the death sentence appropriate, we conclude that the

comment did not "affect the verdict to the prejudice" of the petitioner and, thus, does not constitute reversible error.

As we have stated previously, in order to prove ineffective assistance of counsel, the burden is upon the petitioner to show both 1) that counsel's performance was deficient, and 2) that there is a reasonable probability that if counsel had not been deficient, the outcome of the trial would have been different. King, 989 S.W.2d at 330 (citing Strickland, 466 U.S. at 687, 104 S. Ct. at 2064). The petitioner has failed to meet either prong of this test. At the time that the State made the comment above, the petitioner's trial counsel had already interrupted the State's closing argument once, immediately prior to the State's improper comment, with an objection that was overruled by the trial court. Even assuming that counsel were deficient in failing to object to the comment, the petitioner has failed to meet his burden of showing that the deficiency changed the outcome of the trial.

### F. Petitioner's Counsel Were Ineffective for Failing to Request Jury Instructions and for Failing to Object to the Trial Court's Improper Jury Instructions

The petitioner first submits trial counsel were ineffective in failing to request jury instructions on statutory and non-statutory mitigation factors. Statutory factors included the petitioner's youthfulness and his "substantial mental impairment." Tenn. Code Ann. § 39-13-204(j)(7). Non-statutory factors asserted are his remorse, his difficult childhood, including abuse by his father, the love and support of his family and friends, his lack of intent to kill, and his not resisting arrest.

Second, the petitioner asserts trial counsel failed three times to object to the trial court's charge to the jury that the "verdict must be unanimous and each juror must sign his or her name beneath the verdict." The petitioner argues this instruction was an erroneous interpretation of the law which instructed the jury that in order for the petitioner to receive a life sentence, the verdict had to be unanimous.

The State contends that the petitioner has again waived this issue by failing to present it on direct appeal. Further, the issue was not preserved in the petitioner's amended petition and, consequently, not addressed on the merits by the post-conviction court. In the alternative, the State submits the "youthful offender" criterion was not supported by the evidence, while the jury was in fact charged regarding Nichols's substantial impairment. With respect to non-statutory factors, the State notes there was no obligation to charge the jury thereon prior to November 1, 1989; however, the trial court did charge the jury that they might consider "any other mitigating factor" raised by the evidence produced by either side. The State also asserts that it is well settled law in this state that the "unanimous verdict" charge is constitutional and a correct statement of the law, and there was no ineffective assistance in counsel's failure to object to this instruction.

The jury was charged on the following mitigating factors:

(1) The murder was committed while the defendant was under the influence of extreme mental or emotional distress.

(2) The defendant acted under extreme duress.

(3) The capacity of the defendant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was substantially impaired as a result of mental disease or defect which was insufficient to establish a defense to the crime but which substantially affected his judgment.

(4) Any other mitigating factor which is raised by the evidence produced by either the prosecution or the defense.

Thus, the jury was in fact charged pursuant to Section 39-13-204(j)(8) that they might consider that the petitioner's mental impairment substantially affected his judgment. In determining whether the petitioner's youthfulness was an applicable mitigating factor, "courts should consider the concept of youth in context, i.e., the defendant's age, education, maturity, experience, mental capacity or development, and any other pertinent circumstance tending to demonstrate the defendant's ability or inability to appreciate the nature of his conduct." State v. Adams, 864 S.W.2d 31, 33 (Tenn. 1993); see also State v. Carter, 908 S.W.2d 410, 413 (Tenn. Crim. App.), perm. app. denied (Tenn. 1995). Herein, the petitioner was a married, twenty-eight-year-old high school graduate at the time of the murder. He had served in the military and received promotions to the level of assistant manager at Godfather's Pizza. Trial counsel described him as very bright and articulate. The evidence did not support charging the jury to consider the petitioner's "youthfulness" and, therefore, there was no failure by trial counsel to request such an instruction.

As to non-statutory factors in mitigation, the jury was charged pursuant to Section 39-13-204(j)(9) that they might consider "any other mitigating factor" raised by the evidence.

With respect to the "unanimity" issue, the trial court instructed the jury that the form of the verdict should be either "we, the jury, unanimously find that the punishment shall be death," or, "we, the jury, unanimously find that the punishment shall be life imprisonment." After each of the above possible verdicts was stated, the jury was charged that the "verdict must be unanimous and each juror must sign his or her name beneath the verdict."

The petitioner essentially argues that the jury was not properly instructed on the effect of reaching a nonunanimous verdict. Our supreme court rejected a similar argument in State v. Brimmer, 876 S.W.2d 75, 87 (Tenn.), cert. denied, 513 U.S. 1020, 115 S. Ct. 585, 130 L. Ed. 2d 499 (1994), stating:

As this Court said in *State v. King*, 718 S.W.2d 241, 249 (Tenn. 1986), "[t]here is no way a jury can impose a sentence if it is not unanimous in its decision." T.C.A. § 39-13-204(h) specifically provides that if the jury cannot ultimately agree as to punishment the trial judge shall dismiss the jury and impose a sentence of life imprisonment. *See State v. Thompson*, 768 S.W.2d 239, 252 (Tenn. 1989).

Accordingly, the petitioner's complaints regarding the jury instructions are without merit.

### G. Counsel Rendered Ineffective Assistance by Failing to Raise at Trial or On Appeal that Death by Electrocution is Cruel and Unusual Punishment

While asserting that this issue is another instance in which counsel were ineffective, the petitioner also contends this issue "is not waived because it relies on newly discovered facts, which could not have been discovered by previous counsel" at trial or on appeal. The petitioner submits that this court must consider this issue now because of additional scientific knowledge demonstrating that electrocution is cruel, by the fact that it remains the method of execution in only four states at present, and because it is also unusual, all in violation of the Eighth Amendment to the United States Constitution and Article I, Section 16 of the Tennessee Constitution. Petitioner asserts the need to address this issue is further illustrated by the "shifting opinions of the United States Supreme Court and the lower federal courts" on which method of execution is more or less humane than others.

The State observes that no argument or reference to the record with respect to any ineffective assistance of counsel is argued on this issue and it is therefore waived. Addressing the merits of this issue, the State maintains that the constitutionality of execution by electrocution has often been upheld by our supreme court. In addition, the legislature has now given defendants sentenced to death the option of choosing between electrocution or lethal injection. See Tenn. Code Ann. § 40-23-114(c). Thus, the petitioner will not face electrocution unless he chooses that method of execution.

The post-conviction court found that any allegations concerning the constitutionality of the death penalty statute were held to have been previously determined, waived, or found meritless. See State v. Smith, 993 S.W.2d 6 (Tenn.), cert. denied, 528 U.S. 1023, 120 S. Ct. 536, 145 L. Ed. 2d 415 (1999); State v. Pike, 978 S.W.2d 904 (Tenn. 1998), cert. denied, 526 U.S. 1147, 119 S. Ct. 2025, 143 L. Ed. 2d 1036 (1999) (holding that death by electrocution is not cruel and unusual punishment); State v. Nesbit, 978 S.W.2d 872 (Tenn. 1998), cert. denied, 526 U.S. 1052, 119 S. Ct. 1359, 143 L. Ed. 2d 520 (1999); State v. Vann, 976 S.W.2d 93 (Tenn. 1998), cert. denied, 526 U.S. 1071, 119 S. Ct. 1467, 143 L. Ed. 2d 551 (1999).

This assignment is without merit.

**H. Trial and Appellate Counsel Rendered Ineffective Assistance by Failing
to Argue in the Trial Court or on Appeal that Requiring Petitioner to
Turn Over His Psychiatric Expert's Rough Notes, Which Included
Statements Made by Petitioner to His Psychiatric Expert, Violated
Petitioner's Right to Remain Silent in Violation of the Fifth and
Fourteenth Amendments to the United States Constitution and
Article I, Section 9 of the Tennessee Constitution**

At trial and on appeal, counsel objected to the trial court's ruling that the notes of their expert psychologist, Dr. Engum, had to be turned over to the State because no final report had been prepared of Dr. Engum's ongoing psychological evaluation of the petitioner. In fact, no report was prepared until the second day of the sentencing hearing. Counsel argued that turning over Dr. Engum's notes violated Rule 16, Tennessee Rules of Criminal Procedure, and the attorney work product doctrine. On appeal, our supreme court held that the notes were discoverable under Rule 16(b)(1)(B). Nichols, 877 S.W.2d at 730. However, the petitioner here asserts that counsel were ineffective for failing to also argue that being ordered to turn over the notes violated his state and federal rights against self-incrimination.

The State maintains that where a defendant initiates a psychiatric evaluation and introduces evidence based thereon in the sentencing phase of a capital case, the defendant's right against self-incrimination is not violated by the State's use of the defendant's own evidence in rebuttal of the defense expert's testimony. See State v. Martin, 950 S.W.2d 20, 24 (Tenn. 1997); State v. Thompson, 768 S.W.2d 239 (Tenn. 1989), cert. denied, 497 U.S. 1031, 110 S. Ct. 3288, 111 L. Ed. 796 (1990). The State concludes that because the prosecution's use of Dr. Engum's notes was clearly for the limited purpose of rebuttal, there was no violation of the petitioner's rights and thus, no ineffective assistance by counsel in failing to raise this issue.

The post-conviction court concluded that while "20-20 hindsight may indicate that the failure to prepare a final report may have been imprudent, it has not been established that this affected the verdict." Trial counsel testified that the notes in the hands of the prosecution may have allowed a more thorough cross-examination of Dr. Engum, however, counsel did not believe the decision affected the jury's decision. We concur that the petitioner has failed to establish that the prosecution's use of Dr. Engum's notes affected the jury's decision. Accordingly, this claim is without merit.

### Issue II. "Kyles v. Whitley" Accumulation of Prejudicial Errors

The petitioner maintains that the numerous errors by trial counsel, taken together, satisfy his burden under Strickland to establish that trial counsel were ineffective and, as a result, the confidence in the outcome of the trial was undermined.

The State disagrees and submits that the petitioner has failed to meet his burden on each claim raised.

We have considered, individually, the claims of the petitioner and found them to be without merit. Considering them together neither affects our previous decisions nor undermines our confidence in the outcome of the proceedings against the petitioner. Accordingly, this claim is without merit.

## Issue III. The Findings of Fact by the Court Below Were Clearly Erroneous

The petitioner submits that this court need not accept the post-conviction court's findings of fact because they are "clearly erroneous." The State disagrees and argues that the petitioner has failed to meet his burden of proof with respect to each of his claims.

"[W]e are bound to adhere to the settled rule that the findings of the trial court, upon questions of fact, are conclusive unless this Court finds that the evidence preponderates against the lower court's judgment. Such findings of a trial judge in an oral hearing, who sees and hears the witnesses testify, and hears and considers conflicting testimony, will be given the weight of a jury verdict." Long v. State, 510 S.W.2d 83, 86 (Tenn. Crim. App. 1974) (citations omitted); see Owens v. State, 13 S.W.3d 742, 755 (Tenn. Crim. App. 1999) (stating that the findings of the post-conviction court "are presumed correct unless the evidence preponderates otherwise"). We have reviewed the findings of fact made by the post-conviction court and do not conclude that the evidence preponderates against them. Accordingly, this assignment is without merit.

## Issue IV. The Sentence of Death in the Instant Case Must Be Set Aside as the Imposition of Death is Unreliable and Violates the Values Recognized and Protected by the Eighth and Fourteenth Amendments to the Constitution of the United States and Article 1, Section 16 of the Tennessee Constitution

Relying on Justice Scalia's concurring opinion and Justice's Blackmun's dissenting opinion in Callins v. Collins, 510 U.S. 1141, 114 S. Ct. 1127, 127 L. E. 2d 435 (1994), the petitioner submits that the death penalty as currently structured is unworkable and thus unconstitutional.

The State responds that our supreme court has repeatedly upheld the constitutionality of the death penalty and, therefore, this issue is without merit. In addition, the issue was not raised on direct appeal and is thus waived.

Again, the post-conviction court found that all issues regarding the constitutionality of the death penalty were either previously determined, waived, or without merit. See State v. Burns, 979 S.W.2d 276 (Tenn. 1998), cert. denied, 527 U.S. 1039, 119 S. Ct. 2402, 144 L. Ed. 2d 801 (1999) (rejecting general challenge to death penalty statutes); State v. Smith, 993 S.W.2d 6 (Tenn.), cert. denied, 528 U.S. 1023, 120 S. Ct. 536, 145 L. Ed. 2d 415 (1999) (rejecting claim that statutes allow death penalty to be imposed arbitrarily or capriciously). We concur that this claim is without merit.

**Issue V.   The Death Sentence is Unconstitutional, Because It Infringes Upon Petitioner's Fundamental Right to Life, and is Not Necessary to Promote Any Compelling State Interest**

The petitioner argues that the death penalty is unconstitutional because it infringes upon his fundamental right to life.  This argument has been considered and rejected by our courts.  See State v. Mann, 959 S.W.2d 503, 536 (Tenn. 1997), cert. denied, 524 U.S. 956, 118 S. Ct. 2376, 141 L. Ed. 2d 743 (1998); State v. Bush, 942 S.W.2d 489, 523 (Tenn.), cert. denied, 522 U.S. 953, 118 S. Ct. 376, 139 L. Ed. 2d 293 (1997).  The petitioner's claim that capital punishment "is not necessary to promote any compelling state interest" has also been rejected by our supreme court in Bush:

> [C]apital punishment is an expression of society's moral outrage at particularly offensive conduct.  This function may be unappealing to many, but it is essential in an ordered society that asks its citizens to rely on legal processes rather than self-help to vindicate their wrongs.
>
> The Tennessee Supreme Court has held that the state's death penalty statute, *per se*, meets due process requirements.  *See State v. Black*, 815 S.W.2d 166, 190 (Tenn. 1991); *see also State v. Groseclose*, 615 S.W.2d 142 (Tenn.), *cert. denied*, 454 U.S. 882, 102 S. Ct. 366, 70 L. Ed. 2d 193 (1981).

942 S.W.2d at 523 (quoting Gregg v. Georgia, 428 U.S. 153, 183, 96 S. Ct. 2909, 2930, 49 L. Ed. 2d 859 (1976)).

## CONCLUSION

Based upon our careful review of the record and the authorities, we affirm the judgments of the post-conviction court.

_____
ALAN E. GLENN, JUDGE

-88-